**ACKERMAN–CHILLINGWORTH, DIVISION OF MARSH & McLENNAN, INCORPORATED, a Delaware Corporation, et al., Plaintiffs,**

v.

**PACIFIC ELECTRICAL CONTRACTORS ASSOCIATION, a Hawaii non-profit Corporation, et al., Defendants.**

**Civ. No. 74–217.**

United States District Court,
D. Hawaii.

Nov. 25, 1975.

———◆———

James S. Campbell, Robert A. Rowan, William M. Swope, Honolulu, Hawaii, R. M. Torkildson, Jared H. Jossem, Honolulu, Hawaii, for plaintiffs; Cades, Schutte, Fleming & Wright and Torkildson, Katz & Conahan, Honolulu, Hawaii, of counsel.

Howard K. Hoddick, David A. Ezra, John A. Hoskins, Honolulu, Hawaii, for defendants Pacific Electrical Contractors Ass'n and Walter T. Oda; Anthony, Hoddick, Reinwald & O'Connor, Honolulu, Hawaii, of counsel.

Richard E. Stifel, David F. Day, Honolulu, Hawaii, for defendants The Ins. Co. of North America and Pacific Employers Ins. Co.; Goodsill, Anderson & Quinn, Honolulu, Hawaii, of counsel.

Benjamin C. Sigal, Honolulu, Hawaii, for defendants International Brotherhood of Electrical Workers, Local No. 1186 and Antone Fujikawa; Shim, Sigal, Tam & Naito, Honolulu, Hawaii, of counsel.

1. General agents are authorized by insurance companies to solicit applications for insurance and effectuate contracts. *See* Haw. Rev.Stat. § 431–361.

2. Solicitors are salesmen appointed by general agents primarily to solicit applications for insurance and to collect premiums on a commission basis. *See* Haw.Rev.Stat. § 431–363.

3. Plaintiffs also alleged violation of § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(1) (1973), but did not prosecute this cause of action in their moving papers or at oral argument. Likewise, plaintiffs have dropped *sub silentio* a pendent state antitrust claim.

## DECISION

WONG, District Judge.

Plaintiffs are general agents [1] and solicitors [2] of insurance in Hawaii. Defendants are the Pacific Electrical Contractors Association (PECA), and its Executive Secretary, Walter T. Oda; the International Brotherhood of Electrical Workers Local 1186 (IBEW), and its Business Manager, Akito Fujikawa; the Insurance Company of North America (INA), and its wholly-owned subsidiary, Pacific Employers Insurance Company (PEIC), a California corporation.

The parties agree that in October 1973 the IBEW and PECA amended their collective bargaining agreement to require that all signatories participate in an "Association Dividend Group Plan" to provide for workmen's compensation insurance. The plaintiffs allege that pursuant to the labor agreement defendants IBEW, PECA, and INA entered a conspiracy to require the PECA members to purchase workmen's compensation insurance solely from INA and/or PEIC, in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 (1973).[3]

In a second count, plaintiffs allege that the amended collective bargaining agreement is prohibited by § 8(e) of the National Labor Relations Act, 29 U.S.C.A. § 158(e) (1973).[4]

After extensive discovery,[5] both sides filed cross-motions for summary judgment on plaintiffs' claims.[6] Since this

4. This Court has jurisdiction over the labor law questions involved in the suit collateral to the antitrust issues, as well as under § 303 of the Labor Management Relations Act, 29 U.S.C.A. § 187 (1973). *Connell Constr. Co. v. Plumbers Local 100*, 421 U.S. 616, 624, 650, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

5. Over a thousand pages of documents were produced and catalogued.

6. The PECA and Oda counterclaimed that plaintiffs and others conspired to thwart defendants' group approach to workmen's compensation insurance, and attempted to monopolize trade in workmen's compensation insurance, in violation of §§ 1 and 2 of the

Court finds that there is no issue over any material fact, the case is ripe for summary adjudication.

## SUMMARY OF FACTS

### A. *General industry background*

There are approximately 120 electrical contractors in Hawaii, about half of whom are members of the PECA. Most or all contractors have signed a collective bargaining agreement with the IBEW, negotiated for all the contractors by the PECA. Prior to 1974, the contractors purchased their workmen's compensation insurance from numerous insurance carriers, through many different agencies.[7]

Several aspects of state insurance law dampen rate competition among carriers. Hawaii statute requires insurers to file their rates with the Insurance Commissioner. Most insurers satisfy this obligation by subscribing to a rating bureau, which files the same rates on behalf of all of its members. *See* Haw. Rev.Stat. § 431–694.[8] Furthermore, insurers may not give preferred premium rates to group purchasers. Haw.Rev. Stat. § 431–693(a)(5).

The practice of dividend issue somewhat allays these anticompetitive factors. Some months after the expiration of a policy, the carrier's board of directors determines whether a dividend may be declared, based on the size of the insured's claims and the insurer's costs. However, carriers generally do not issue dividends to small employers who pay premiums below a certain threshold.

Groups of employers in the same occupational area are allowed to form "safety groups" and purchase their insurance from a single carrier. Safety groups must be open to all employers in the industry. They play a large role in workmen's compensation coverage on the mainland [9] but, until the defendants' initiative, were uncommon in Hawaii. Safety groups are designed to provide a mechanism for employers, workers, and insurance companies to cooperate to reduce occupational hazards and to improve rehabilitation programs.

Group purchase of insurance allows reductions in the cost of insurance in an otherwise relatively noncompetitive industry in several ways. First, increased effectiveness of safety and rehabilitation programs reduces the size of premiums (still calculated on an individual employer basis). Second, carriers are more likely to vote favorable dividends when they know they might otherwise lose a large volume of business to a competitor. Although carriers are not allowed to guarantee dividends in advance, they may tell a prospective customer what their past practices have been and what their *minimum* retention will be in the future. Third, dividends can be calculated on the combined experience of the employers and this results in payment of dividends (if at all) to every employer, regardless of size. In an industry of small employers,[10] this latter factor is likely to be very important.

Sherman Act. Similar causes of action were alleged in *M & I Electric Co. v. Ackerman-Chillingworth*, Civ. 74–306 (D.Haw. filed Dec. 10, 1974), which was consolidated with the instant case for pretrial motions. Neither the counterclaim in this case nor the claim in 74–306 are currently before the Court.

7. At one time, according to an undated document, there were 22 carriers and 20 agencies writing 68 policies for the PECA. Doc. 2301.

8. The uniformity of workmen's compensation insurance rates is attested by the fact that the premium rate was never the subject of discussion between any of the insureds or insurers in this action. *See* Doc. 197–200, 204–11, 2013–15.

9. Doc. 2446–53. There are approximately 50 national groups, 170 in California, and 10 in other Western states.

10. Approximately half of the contractors paid premiums under $5,000. Doc. 2301.

Samuel Alcorn, National Vice-President of Bayly, Martin & Fay, described group plans in the following terms: [11]

> The customary desire of an association to go into a group Workmen's Compensation program is to have a means to achieve lower costs for its members by bargaining for the entire group with an insurance carrier.
>
> Such programs generally have their greater appeal to members with small or medium sized premiums . . . .
>
> . . . . . .
>
> We have not run into programs in the past where participation in an association program was mandatory. To the contrary, *most associations are opposed to being obligated to have all of their members under the sponsored insurance program [because] lousy operators . . . could drag down the success of a good association program.*
>
> . . . . . .
>
> Group Workmen's Compensation programs can be set up on a "closed" basis or on an "open" basis.
>
> A closed program is one which has a single broker of record or agent—precluding participation by any other agent or broker—even though the other agent or broker might represent the same insurance company.
>
> The open plan is an override to the originating broker, but permits any local agent or broker representing the insurance company to place individual accounts within the program.

The originating or coordinating broker earns his override by counseling the association's safety committee, working with the carrier to establish a good safety program, keeping records on losses and processing claims, coordinating credit plans for premium payment, and auditing the carrier's claims file to assure that there is a fair basis for dividend computation.

### B. *The union proposals*

In May 1973 the IBEW made contract-renewal proposals on wage and fringe levels and other matters. The union included a proposal that workmen's compensation insurance be provided through a Taft-Hartley trust fund or by purchase from a single carrier.[12] Under the former approach, the contractors would, in effect, have been self-insurers. Either approach would be to the employees' advantage; the IBEW believed, for two sets of reasons: centralized administration of insurance would lead to better claims service, either through increased industry leverage with a single carrier, or by sympathetic trusteeship administration; and a single insurer would have both the incentives and the opportunity to create adequate safety and rehabilitation programs.[13]

At first the PECA was reluctant to accede to the single-carrier proposal even though the IBEW argued that the Association could supplement its income by charging a fee for administration, and that individual members might also benefit by reduced rates. The membership, however, did agree to amend Article 19 of the collective bargaining agreement so that it endorsed the principle of a trust fund to provide workmen's compensation.[14]

The Martin E. Segal Company, consultants that had provided the IBEW and PECA with technical assistance in the insurance field since 1962, helped

---

11. Doc. 1129–32 (emphasis added). Bayly, Martin & Fay of Hawaii, one of the plaintiffs herein, received Alcorn's letter.

12. Exhibits B and C to Affidavit of Walter T. Oda; Doc. 510–11.

13. The defendants' motivations were recorded in various documents prepared long before there was a hint of litigation, *e. g.*, Doc. 510–11 (minutes of the PECA Board of Directors, May 23, 1973.

Even though monetary benefit levels as such would not be increased directly, the union considered these factors to be important to the workers' welfare.

14. Doc. 497. There were 89 affirmative votes, with no indication of how many of the approximately 120 contractors attended.

survey the contractors' existing insurance practices. In September 1973, it recommended against a Taft-Hartley type of trust fund and in favor of a group plan. Under the plan, eventually adopted in major terms, the individual contractors would continue to pay premiums based solely on factors unique to their business, e. g., type of work, volume of payroll, and safety record. However, the experience of all employers would determine the calculation of dividends. The Segal Company believed that total dividends under the plan would be greater than the sum of dividends the contractors were currently earning.[15]

William D. White, of the Segal Company, concluded that the group plan provided a means of accomplishing many of the Taft-Hartley trust fund goals, including:

1. Centralized purchasing from one insurer.
2. An opportunity for the Association to play a greater role in administering the Workmen's Compensation insurance program.
3. Better service from the insurer.
4. A more generous dividend plan whereby all Association members would ultimately realize savings based on safety efforts and reduced insurance company expenses.[16]

C. *Membership approval*

At meetings in September with the IBEW and in October 1973, the PECA Board of Directors agreed to recommend the group plan to its membership, with the required participation of all signatory employers. A report by the Associa-

tion's Executive Secretary Oda suggested that the "dividends received could be allocated towards off-setting PECA dues. Since the non-association members would also be participating, this could be a means of assessing them for the services we provide." [17]

Nevertheless, Oda's report continued, "The primary objective of the Fund, besides better quality service, faster claim processing, cooperation in industry safety programs, etc., is to strive for a lesser rate to each participating contractor." [18]

Oda has been a licensed insurance solicitor since 1957, although he was inactive in recent years prior to these events. Because reimbursement to the Association for its expenses in operating the group plan by allocation of dividends would be both uncertain and delayed, it was suggested that Oda could sell and write policies and credit his net commissions (after personal taxes) to the PECA.[19]

The Board placed discussion of the proposed group plan on the agenda of the membership meeting of October 26, 1973, and invited non-member contractors to attend, since the plan would also affect them. Berton Jacobson, Executive Vice-President of the Segal Company, explained why the Taft-Hartley type of trust fund, specified in the existing Article 19 on Workmen's Compensation, was not feasible. He explained the proposed Association Dividend Group Plan and its mandatory nature.[20] The membership approved the following amendment to Article 19:

Section 1. The parties agree that present practices and procedures for compensation of employees for occupa-

15. Doc. 249–50.

16. Doc. 2477.

17. Doc. 72.

18. Doc. 76.

19. *See* Doc. 495, 573. A phrase used throughout the minutes of the PECA Board

is Oda "could be named agent of record for commission purposes." The "agent of record" is an industry term for the solicitor who sells a particular policy to a particular customer.

20. Doc. 490–91. Jacobson estimated an overall 15% saving could be expected under the group plan.

tional illness and injuries are unsatisfactory, and require substantial improvement.

Section 2. The parties agree that all Employers will participate in an "Association Dividend Group Plan" providing for workmen's compensation insurance coverage for their employees, as recommended by the actuary designated by the parties. The Plan will be administered by PECA. The Union shall be consulted by PECA prior to making any important policy decisions which may affect the employees.

Section 3. The Plan shall be initiated February 1, 1974.[21]

D. *Implementation of the group plan*

The Segal Company sent a specification letter to nine insurance carriers seeking bids for the workmen's compensation coverage of all signatory electrical contractors.[22] The letter sought written proposals regarding promptness of claims payments, a safety program, rehabilitation of injured workmen, and a dividend plan. It did not specify a general agent or solicitor, or say whether the plan was "open" or "closed." Three insurance companies submitted bids.[23]

The proposal from First Insurance Company of Hawaii offered a dividend plan "applicable to individual risk, with the amount of dividend being determined on the basis of that risk's premium size and experience."[24] White, who handled the bid selection for the Segal Company, testified that First Insurance "did not . . . even come close to what we had asked for. . . . We had asked for . . . a dividend group plan. They did not submit one. [F]or that reason it was rejected."[25]

The Segal Company recommended the INA proposal, which quoted a 31.9% minimum retention, over the Argonaut Insurance Companies proposal, which quoted a 40.78% retention.[26] The PECA Board of Directors adopted the recommendation on January 24, 1974. At this time the defendants contemplated that Oda would write policies and turn over his net commissions to pay expenses incurred in the adoption and administration of the plan.[27]

Oda was licensed as a solicitor through the Yamada Insurance Agency, a general agent. Therefore it was necessary that any individual policies for the group plan sold by Oda be written through Yamada, which entered into a non-exclusive agency agreement with INA for that purpose.

On January 31, Oda wrote to all 120 signatory contractors reminding them of

21. Doc. 270–71.

22. Doc. 220–22, 196, 571. Oda gave a copy of the specifications to an additional insurance company. Doc. 2442–43.

23. *See* Doc. 197–200, 204–11, 2013–15. The alleged reasons for the lack of response are the subject of the counterclaim in this suit, and the action in Civil 74–306. *See* note 6 *supra.*

24. Doc. 204.

25. Deposition of William D. White, Mar. 15, 1975, at 39. The First Insurance proposal is ambiguous as to whether the minimum premium to be considered for dividend payment would be $5,000 or $25,000. *Compare* Doc. 206 *with* Doc. 207 *and* Doc. 209. Even the former figure, however, would be unreasonably high for an association in which approximately half of the contractors pay premiums under $5,000. *See* note 10 *supra.*

Plaintiffs interpret Oda's testimony, Deposition, Feb. 27, 1975, at 97, to mean that the bid was rejected because it required a free choice of insurance agent by the insured and therefore did not conform to the bid request. Aside from the fact that Oda had no knowledge why the proposal was rejected, White's testimony on the point explains the reason and he was in charge of the process. In addition, the bid proposal did not specify that there could be no free choice of insurance agent, *see* Doc. 221–22, although the proposal apparently *anticipated* that Oda would be writing most of the policies: "In arriving at a retention factor, it should be assumed that all policies will be combined for commission purposes . . . ." Doc. 222.

26. Doc. 196; *see* Doc. 2009–15. The INA proposal indicated that the policies would be issued through its subsidiary PEIC.

27. Doc. 573.

the terms of the new Article 19 and soliciting applications for INA policies.[28] Oda followed up on this initial letter numerous times. Five contractors expressed a desire to remain with their then-present carriers or agents.[29] Oda responded that the bargaining agreement required use of the designated *carrier*. Plaintiffs have presented no evidence, however, to indicate that Oda or any of the defendants ever suggested to the contractors that they had to *buy* their insurance *through Oda* or coerced them to do so—notwithstanding the affidavit of a plaintiff that a representative of the PECA told him, on or about June 1974, that the plaintiff "would not be allowed to *sell* or service workmen's compensation insurance business with any of the signatory electrical contractors . . . regardless of whether such insurance was placed with [PEIC]." [30] Article 19 itself is silent on the subject.

For its part, INA insisted many times, as early as February 1974, that the PECA plan "will be an 'open' group as all our safety groups are and that any licensed producer can participate in our group subject to our internal requirements." [31] INA communicated this to the Segal Company, to Oda, to the PEIC San Francisco office, to Yamada, and to the PECA's attorney.[32]

Yamada's president directly advised Bayly, Martin & Fay of Hawaii (BM&F)—the plaintiff referred to in the previous paragraph—that any general agent representing PEIC could issue policies to electrical contractors.[33] In fact, PEIC appointed BM&F general agent on August 20, 1974, and that appointment is still in effect.[34]

In addition, agents other than Oda sold INA/PEIC insurance to Mid-Pac Electric in March 1974 and 1975, and to U.S. Industries, Inc. (including as a division Wasa Electrical Service) in April 1975. The sales agent in the latter instance is parent of one of the plaintiffs herein.[35]

Oda was disturbed by the prospect of other agents writing insurance since Oda's net commissions went to pay the PECA for the expense of setting up and administering the group plan,[36] and eventually to help reduce premiums. Oda rejected a proposal from Atlas Insurance Agency in July 1974 that Atlas serve as coordinating broker for the plan.[37]

None of the plaintiffs sought to compete with Oda or Yamada for the business of the electrical contractors under the group plan.[38] Rather, they first

---

28. Doc. 281.

29. Mauna Kea Electric, Doc. 131, Oda Deposition 114; National Concrete Sawing Co., Doc. 299, Oda Deposition 37–38, 130; Ides Electrical Service, Doc. 311; Reddy Electric, Doc. 114–115, 116; Yamatani Electric, Doc. 106, 439, Oda Deposition 138–39. There is no indication in the record which of these contractors, if any, were members of the PECA.

30. Affidavit of Trenor Thompson (emphasis added).

31. Doc. 2424–25.

32. Doc. 2424–25, 166–67, 150–51, 121–22, 1117–18.

33. Deposition of Thomas H. Takamune, Feb. 25, 1975, at 50–53.

34. Affidavit of Clifford J. Miyoi.

35. Affidavit of Michael Jones.

36. Doc. 63–64, 192–93.

37. Doc. 54–55. *See* text following note 11 *supra* regarding the role of a broker in group plans.

38. The Court can only speculate on their reasons. Perhaps they believed that the group plan violated the antitrust or insurance laws, whether it was open or closed. Perhaps they did not want to become agents for INA/PEIC (although INA indicated that even that wasn't necessary; they could deal through Yamada, see Doc. 1117–18). Many plaintiffs certainly believed that the plan was closed, and that they were precluded from writing insurance. *See, e. g.,* Doc. 2438, 1128–32. This was one of many misconceptions about the intentions of the IBEW and PECA. *See, e. g.,* Doc. 1128–32. The Court regrets the extent to which lack of communication among the parties may have led to this litigation, and hopes that

sought a declaration from the Insurance Commissioner that the plan was illegal. When the Commissioner and Attorney General concluded that there did not appear to be a violation of the Hawaii Insurance Law,[39] plaintiffs instituted the present action.

## THE ANTITRUST CLAIMS

Plaintiffs' complaint charges that the IBEW, PECA, and INA entered into a conspiracy to require contractors to purchase their workmen's compensation insurance solely through INA/PEIC, and that they have excluded plaintiffs from writing or renewing insurance with members of the PECA, thus violating § 1 of the Sherman Act. The legal argument in their motion for summary judgment includes the additional allegation that defendants established a monopoly in favor of INA, Yamada and Oda,[40] which would be a violation of § 2. The Court will treat each issue in turn.[41]

### A. *Alleged* per se *violations of* § 1

Plaintiffs cite several cases which establish the proposition that in some circumstances collective refusals to deal, or boycotts, constitute *per se* violations of § 1.[42] *See United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). They characterize defendants' actions as a boycott, and therefore illegal *per se* without regard for the motivations of the defendants or the actual economic consequences of their activity. However, this Court finds that the dealings among the defendants do not fall within the class of automatically proscribed conduct.

### *Boycott of insurance carriers*

Plaintiffs quote at length a good summary of boycots in *E. A. McQuade*

this note will help others in the future to avoid the same mistake.

39. Doc. 1052. Commissioner Edwin H. Honda wrote to the Board of Underwriters:
    "The plan, as we understand it, will operate in the following manner:
    "1. All Association members must participate in the insurance program.
    "2. Dividends, if any, will be paid directly to each insured. The PECA will not participate in the dividends.
    "3. Any electrical contractor, member or non-member, will be able to participate in the program.
    "4. Dividends, if any, will be paid on a flat amount basis to all participants."

40. Plaintiffs' Opening Brief 24.

41. The sale of workmen's compensation insurance in Hawaii by Oda or any of the plaintiffs at times relevant to this suit is an integral part of an interstate transaction because the insurer is a California corporation. The Supreme Court "has long held that 'there is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states.'" *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783, 95 S. Ct. 2004, 2011, 44 L.Ed.2d 572 (1975), *quoting United States v. Frankfort Distilleries*, 324 U.S. 293, 297, 65 S.Ct. 661, 89 L.Ed. 951 (1945).
    Since a taxi trip between stations to change trains as part of an interstate journey has been held to be in the stream of commerce for Sherman Act purposes, *see United States v. Yellow Cab Co.*, 332 U.S. 218, 228–29, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), it follows that intrastate competition for the sale of interstate insurance policies is within the reach of federal antitrust law.

42. "It is often said that the concerted refusal to deal—or its evil-sounding equivalent, 'boycott'—is unlawful per se. But there may be restraints with some boycott characteristics that are not or should not be automatically unlawful. . . . Indeed, one *might even hold that any agreement* affecting competitive behavior is necessarily an agreement that the collaborators will not buy or sell on any other terms; and there is no sharp logical distinction between refusing to sell at all and refusing to sell except on condition." P. Areeda, *Antitrust Analysis* 287 (1967).

*Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 186–87 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973):

> The first group [of cases], exemplified by *Eastern States Retail Lumber Dealers Assoc. v. United States,* 234 U.S. 600 [34 S.Ct. 951, 58 L.Ed. 1490] (1914), have involved horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market. . . .
>
> *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207 [79 S.Ct. 705, 3 L.Ed.2d 741] (1959), illustrates a second category of group boycott cases, involving vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination. . . .
>
> Unlike these first two categories, the third group of cases has concerned combinations designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors. . . .

The defendants are not a horizontal combination of traders, so *Eastern States* does not apply. Nor is there a vertical combination among INA at one level, and IBEW/PECA at the other, to exclude from the market one of their competitors, so *Klor's* is not applicable. Article 19 is not a vertical combination, and there is no evidence that INA conspired with IBEW/PECA to exclude other insurance companies. The defendants invited 10 carriers to participate in the bidding.

The third category of cases described in *McQuade* is merely a variant of groups one and two. It still requires a boycott *victim,* and there is none under this theory of the case.[43]

### Boycott of insurance agents

In their second theory, plaintiffs maintain that "Each contractor is contractually prohibited from doing business with the insurance agent of its choice regardless of preference," and that "the labor agreement completely eliminates the plaintiffs' opportunity to compete with . . . Oda."[44] Plaintiffs have neither facts nor law to support this allegation.

Article 19 contains no contractual obligation that its signatories deal with Oda. Neither Oda nor any of the other defendants ever urged this interpretation upon any of the contractors. INA continually reminded the other defendants that the group plan was an open plan: any solicitor or agent of INA/PEIC could sell and write policies. At least one plaintiff was aware of this and became a PEIC general agent.

Moreover, Oda was not the only solicitor to write policies under the group plan, both before and after initiation of this suit. Plaintiffs, for their own reasons, *did not attempt to compete* with Oda. This does not mean that they were foreclosed—to the extent of a *per se* illegal boycott—from dealing with the contractors, even if a representative of the PECA told a plaintiff he would not be "allowed" to sell insurance to any of the contractors.

43. Plaintiffs first theory would probably be equally applicable to the several hundred group plans described in note 9 *supra,* but plaintiffs have not cited any holding that a similar plan violates the antitrust laws.

Plaintiffs lay great emphasis on the fact that Article 19 requires all contractors to participate in the group plan, but they have not demonstrated the legal significance of this fact with respect to *per se* violations. It neither increases nor diminishes the strength of plaintiffs' boycott argument because the targets of the requirement to place insurance with the winning bidder are not antitrust boycott victims. The contractors who may be required by their collective bargaining agreement to deal with INA/PEIC "against their wishes" are "victims," if at all, of majority rule and American labor policy.

44. Plaintiffs' Opening Brief 20, 22.

Plaintiffs misunderstood the terms of the agreement among the defendants.[45] But their misunderstandings cannot be used to test the legality of the defendants' activity. Plaintiffs have neither alleged nor presented evidence of an explicit group refusal to deal with all solicitors and agents save Oda/Yamada.

Assuming for purposes of summary judgment that a trier of fact could reasonably infer that an *implicit* agreement existed to use Oda exclusively, there would still not be a *per se* violation of § 1. Examining again the *McQuade* catalogue of group boycotts in the previous section,[46] there is no *Eastern States* horizontal combination of traders.

Nor would such an agreement fall within the *Klor's* rule. In *Klor's*, a powerful buyer, Broadway-Hale, allegedly conspired with several sellers to deprive the plaintiff—a competitor of the powerful buyer—of the right to deal freely with the sellers. Broadway-Hale used its leverage with the sellers to injure one of its competitors. Under the assumed factual inference of the instant case, the contractors agreed to deal with Oda because his revenues would be paid back to the contractors' association. The inferred agreement exists not for Oda's benefit as a *competitor* of plaintiffs, but for defendants' benefit as buyers or beneficiaries of insurance.

Plaintiffs did not allege or present evidence that any of the defendants is forcing non-PECA members to cease dealing with all other agents and to deal with Oda/PECA in its role as a seller of insurance. These facts would present a closer analogy to the *Klor's* situation than the record of this case reveals. A majority of members of PECA, bargaining agent for all the contractors, did impose a requirement that all contractors buy insurance from the winning bidder. But the agreement did not require the contractors to give their business to

Oda, and it only incidentally affected those plaintiffs who were not agents of the winning bidder, and chose not to become agents, or to write through Yamada. Therefore the arrangement does not even questionably rise to the level of a *per se* boycott. If one of the majority's motives behind the single-carrier requirement was to make it easier for Oda to garner business, its legality must be tested under the rule of reason.[47]

Plaintiffs cite *United States v. Insurance Board*, 188 F.Supp. 949 (N.D.Ohio 1960), and *United States v. General Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Neither case is relevant to their assertions that defendants are engaged in a *per se* illegal boycott. In the first case, which did not even apply a *per se* rule, *see* 188 F.Supp. at 955, an organization of independent insurance agents (representing only stock insurance companies) excluded from membership agents who dealt with mutual companies. In *General Motors*, the automobile manufacturer and three associations of dealers adopted a program to eliminate sales of cars by franchised Chevrolet dealers to discount houses. Both cases involved a group of competitors combining to injure other of their competitors. In the instant case we have a group of buyers allegedly agreeing to deal with the seller of insurance who made them the most attractive offer, an entirely different situation. Plaintiffs argue that this constitutes an illegal boycott, but can cite no case in which such activity has been held to be *per se* illegal. "We must always guard against 'the tyranny of tags and tickets.' Cardozo, Mr. Justice Holmes, 44 *Harv. L.Rev.* 682, 688 (1931)." *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 79 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S. Ct. 752, 24 L.Ed.2d 755 (1970).

On the other hand, defendants point to the *Hawaiian Oke* case which dealt

---

45. *See* note 38 *supra*.

46. *See* text preceding note 43 *supra*.

47. *See* text preceding note 48 *infra*.

with analogous facts. There the Ninth Circuit held that an "agreement between two or more suppliers who have been selling to or through distributor A to transfer their business to distributor B, who is also a party to the agreement" did not constitute a *per se* violation of § 1. *Id.* at 75.

The Court observed that group boycotts "have been held to be illegal per se under section 1 because they are 'naked restraints of trade with no purpose except stifling of *competition*.'" *Id.* at 76. But where the "activity [has] a primary purpose and direct effect of accomplishing a legitimate business objective, [and has merely] an incidental and indirect adverse effect upon the business of some competitors . . . its legality is tested under the 'rule of reason.'" [48]

The *Hawaiian Oke* court concluded that the plaintiff had failed to establish a *per se* antitrust violation because the exclusion of the plaintiff was "merely the incidental result of appellants' agreement to transfer their lines" to a new distributor and that the suppliers had no anticompetitive motive. *Id.* at 80.[49] The Ninth Circuit distinguished cases holding group boycotts to be *per se* violations because in all of those cases "there was a purpose either to exclude a person or group from the market, or to accomplish some other anticompetitive objective, or both." *Id.* at 76. The Court noted there were no price fixing or other similar activities, and stressed that the evidence—as in the instant case—indicated only that the suppliers were dissatisfied with the plaintiff as a distributor. The defendants in *Hawaiian Oke* merely wished to obtain better distribution of their products; here, they merely wish to buy a better service and to save money.

## B. *Reasonableness of defendants' conduct*

■ Plaintiffs have failed to establish by citation or analysis that defendants' activity is a concerted refusal to deal that is illegal *per se*. This Court must therefore examine the motives of the parties, the economic impact of the activity, and its effect upon competition.

The IBEW initiated its proposal for a change in the method of purchasing insurance in order to create opportunities for better claims service for its members, more effective safety plans, and better rehabilitation programs. The PECA eventually agreed to the group-plan approach because it saw several direct benefits for electrical contractors in addition to the direct benefits to its employees. Better safety and rehabilitation programs could reduce premiums. Group purchasing could lead to lower retentions by the carriers. Group evaluation of dividends could make all contractors eligible to receive dividends regardless of the size of their individual premiums, increasing total dividends. Commissions earned by Oda and credited to the PECA could cover expenses incurred in administration of the plan, as well as eventually lead to reduced premiums through a negotiated lower commission.

The unique role of Oda and the mandatory nature of the PECA group plan has set it apart from many similar plans operating elsewhere. The mandatory feature is reasonable because it increases the likelihood of success in achieving the safety, rehabilitation, and cost-reduction goals. In fact, plaintiffs' documents show that most groups are not mandatory because it is to the *group's disadvantage* to be burdened with poor

48. *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1003 & n. 2 (9th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L. Ed.2d 256 (1973), citing and explaining *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, *supra*.

49. *Accord*, *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir. 1972);

*Cartrade, Inc. v. Ford Dealers Advertising Ass'n*, 446 F.2d 289, 295 (9th Cir. 1971), *cert. denied*, 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972); *Marder v. Conwed Corp.*, 378 F.Supp. 109 (E.D.Pa.1974); *Western Wholesale Liquor Co. v. Gibson Wine Co.*, 372 F.Supp. 802 (D.S.D.1974).

risks.[50] These primary, beneficial motives outweigh the fact that the arrangement makes it easier for Oda to dominate the sale of insurance to all contractors, taking business away from plaintiffs, especially since an overwhelming majority of the contractors expressed approval of the plan in the first place.

With regard to Oda's role, it is clear from plaintiffs' evidence that a single broker or solicitor must coordinate the group plan if it is to achieve all of the objectives previously cited.[51] In the § 1 context, it is not only reasonable but laudatory that the coordinating broker be someone both intimately familiar with the industry for whom the service is provided, and willing to use his profits to reduce consumer costs even further.

The motives of the defendants were salutary, and the economic impact beneficial, except arguably upon a handful of contractors, and upon plaintiffs with whom Oda was beginning to compete. This Court cannot conclude that the injury to plaintiffs' business, in light of all the benefits derived from defendants' activities, is proscribed by § 1 as unreasonable. The IBEW, PECA, the Martin Segal Company, Fujikawa, and Oda, developed an idea for a superior method of buying and selling insurance. Their approach was a variant of a plan that had been used extensively in other markets but which was new to Hawaii. Any one of the plaintiffs could have developed the same idea earlier and sold it to the IBEW/PECA. They may still do so in other industries. The record is clear that plaintiffs even now can compete with Oda and Yamada, although most contractors would understandably prefer to deal with Oda because of the additional benefits that may accrue to them.

Plaintiffs were not innovative, however, and thus they lost some of their business to new competitors who had a superior service to offer. The purpose of the antitrust laws, however, is to "protect competition, not competitors; and stiff competition is encouraged, not condemned."[52] By taking the initiative as they did, the defendants have brought an element of competition into an otherwise noncompetitive market, with the probable likelihood of more safety on the job, better rehabilitation for injured workers, savings to employers, and lower prices to consumers.

■ Nor is the reasonableness of defendants' conduct a question of ultimate fact for a jury to decide in this case. This Court has assumed for the purpose of this decision that the majority of electrical contractors agreed with each other and with Oda to cease dealing with the plaintiffs and to deal only with Oda, and required an unwilling minority of contractors to buy from INA, increasing the likelihood they would buy through Oda. As in *Hawaiian Oke*, "[n]othing in the record suggests, much less would support an inference, that their purpose was to eliminate or damage plaintiff[s], to force [them] to comply with unlawful demands, rather than to get better [service]." 416 F.2d at 78.

Even if plaintiffs presented evidence, as did Hawaiian Oke, "that the expressed reason for the change may not have been valid, and hence may not have existed, [and] some sinister, anticompetitive motive [could] be inferred" by the trier of fact, "[s]urely, liability for treble damages should not be based on such second guessing of business judgment by a jury." *Id.* However, plaintiffs here, after seeking and obtaining full discovery, after having been satisfied to move for summary judgment,[53] presented no

50. *See* text following note 11 *supra.*

51. *Id.*

52. *Travelers Ins. Co. v. Blue Cross*, 481 F.2d 80, 84 (3d Cir. 1973) ("To be sure, Blue Cross' initiative makes life harder for commercial competitors").

53. Making inapplicable the strictures of *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L. Ed.2d 458 (1962) ("We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is

evidence to contradict the reasonableness of defendants' action. As in *Hawaiian Oke,* there is insufficient evidence to sustain a verdict for plaintiffs,[54] so the § 1 claim in this case should proceed no further.

### C. Alleged violations of § 2

■ Although not stated in their complaint, plaintiffs allege in their brief without elaboration that "a monopoly has been established in favor of INA and Yamada Insurance Agency, Ltd. and the solicitor, Mr. Oda. Out of a potential of 128 customers, Mr. Oda has 'solicited' and has placed 114 workmen's compensation insurance policies (Oda Answers to Interrogatories 32)." [55]

It is possible that in the course of an appropriate § 2 claim different antitrust consequences would flow from Article 19's mandate that all contractors buy from the designated carrier, or from the rebate arrangement between Oda and the PECA. *See United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 340, 342 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). Even though Oda has captured almost all of the contractors' workmen's compensation insurance business, however, plaintiffs have presented no evidence to indicate that "sale of workmen's compensation insurance to electrical contractors in Hawaii" is the relevant market for judging a § 2 claim. On the basis of the record before it, this Court believes that it is not the relevant market and therefore no illegal monopoly has been established in favor of Oda.

### D. Exemptions from antitrust liability [56]

### The labor exemption

■ The IBEW and PECA have sought antitrust immunity under a nonstatutory exemption that embraces certain labor activity. The area of law is a complicated one since it arises from the conflict between two cornerstones of 20th century economic policy, the federal antitrust and labor statutes. Fortunately, Judge Sneed has provided an illuminating history of the difficult area, and has synthesized from its key cases rules for the courts of this circuit to follow in deciding the issue. *See Bodine Produce, Inc. v. United Farm Workers Organizing Committee,* 494 F.2d 541 (9th Cir. 1974).

The Supreme Court faced the issue of whether certain union combinations with non-labor groups were exempt from antitrust liability in *Allen Bradley Co. v. Electrical Workers Local 3,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945):

Our problem in this case is therefore a very narrow one—do labor unions violate the Sherman Act when, in order to further their own interests as wage earners, they aid and abet business men to do the precise things which the Act prohibits.

*Id.* at 801, 65 S.Ct. at 1536. "Answering the question affirmatively," wrote Judge Sneed, "the Court was careful to distinquish [*sic*] such aiding and abetting from unilateral union activity which may achieve an end identical to that which results from labor and busi-

---

largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.").

54. 416 F.2d at 80. The court concluded that "No unreasonable restraint was proved." *Id.* at 74; *accord, Bushie v. Stenocord Corp.,* 460 F.2d 116 (9th Cir. 1972); *Cartrade, Inc. v. Ford Dealers Advertising Ass'n,* 446 F.2d 289, 295 (9th Cir. 1971).

55. Plaintiffs' Opening Brief 24.

56. Of course the question of defendants' immunity under any exemption is an entirely

different issue than whether or not their activity constitutes a restraint of trade that is illegal under the Sherman Act, and logically precedes that latter issue. *See Connell Constr. Co. v. Plumbers Local 100,* 421 U.S. 616, 634–37, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The Court has dealt with the merits of the antitrust issues first because it felt that the discussion of the exemptions would be more understandable when related to a full explanation and discussion of plaintiffs' claims.

ness acting in concert." 494 F.2d at 550–51. Judge Sneed concluded:

> The type of activity by non-union entities sufficient to draw unions with whom they deal within the sphere of *Allen Bradley* was and remains uncertain. Union-imposed restraints which serve purposes closely related to wage, hours, and conditions of employment generally are considered free of *Allen Bradley* taint. On the other hand, union cooperation which enables one or more employers to obtain control of the supply and price of a certain product in a particular market, or to make possible the elimination of troublesome competition, is unmistakably tainted.

*Id.* at 551 (footnotes omitted). This distinction continues to be valid, the Ninth Circuit ruled, despite two post-*Allen Bradley* opinions which the Supreme Court issued without a majority decision.[57]

Defendants argue the applicability of the labor exemption as if the union were "acting solely in its own self-interest [and simply], forced reluctant employers to yield to certain of its demands."[58] If that were the situation, we would be dealing with a union-imposed restraint related to a condition of employment, probably free of *Allen Bradley* taint.

From the very beginning of its discussions with management, however, the IBEW was also interested in helping the PECA derive revenues from the project. Both the union and the association considered the mandatory nature of the group plan to be important for that reason—as well as for making the plan *qua*

plan more effective. In other words, the IBEW cooperated with Oda/PECA's efforts to obtain control of the sale of workmen's compensation insurance to all electrical contractors in Hawaii. As in *Bodine Produce,* there was in this case an "alliance between [labor] and non-labor business groups . . . to divide markets, or to reduce competition." 494 F.2d at 561. Therefore, the activity is not free from *Allen Bradley* taint and not entitled to immunity by reason of the IBEW's union status.

### The insurance industry exemption

The McCarran-Ferguson Act provides a partial exemption of insurance activities from the Sherman Act. It provides that federal antitrust laws "shall be applicable to the business of insurance to the extent that such business is not regulated by State law," 15 U.S.C.A. § 1012(b) (1963), except that "[n]othing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." *Id.* § 1013(b).

The Insurance Commissioner and Attorney General specifically condoned certain aspects of the PECA/IBEW group plan operation: its mandatory nature, the eligibility of all contractors to participate, and its dividend plan.[59] Since the Insurance Commissioner has authority to determine whether a violation of the insurance laws has occurred and to make rules effectuating the laws,[60] the defendants' business was "regulated by State law," to the extent of the Commis-

---

57. *See* 494 F.2d at 551–54, analyzing *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).

Both sides in the instant case deal with *Connell Constr. Co. v. Plumbers Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Defendants correctly distinguish the case, since it analyzed facts and economic circumstances vastly different from those

before this Court. Plaintiffs read the case as sounding the death-knell of the nonstatutory labor exemption. This Court declines to go so far in its interpretation of *Connell,* nor is it necessary to do so.

58. *Intercontinental Container Transp. Corp. v. New York Shipping Ass'n,* 426 F.2d 884, 888 (2d Cir. 1970).

59. *See* note 39 *supra.*

60. Haw.Rev.Stat. § 431–35.

sioner's approval, within the meaning of the McCarran-Ferguson Act.

All of the activities of defendants INA and PEIC material to this action were thereby exempted from liability under the Sherman Act by 15 U.S.C.A. § 1012(b). Furthermore, the evidence does not indicate any agreement by INA/PEIC to exclude either carriers or agents from the market, which if present might make applicable the boycott provision of § 1013(b).

Defendant Oda also seeks shelter under the McCarran-Ferguson umbrella. This Court has found that there was no "boycott of insurance carriers," making the protection unnecessary for that aspect of the case. If there were a boycott, the protection of § 1012(b) would be lifted by § 1013(b). Under these facts, the applicability of the McCarran-Ferguson Act is reduced to a tautology.

The Commissioner's approval, however, did not contemplate Oda's participation as a solicitor, with all the antitrust ramifications that plaintiffs have urged upon this Court, albeit unsuccessfully. Moreover, even if there were regulation by state law of this aspect of the case, the possible factual inference of an implicit agreement to use Oda exclusively [61] brings into play the boycott provision of § 1013(b), removing the immunity of § 1012(b). Therefore

it has been necessary for this Court to reach the merits of the antitrust issues, *supra,* holding that the "boycott" was neither *per se* illegal, nor unreasonable.

## THE LABOR ACT CLAIM

Plaintiffs allege that Article 19,[62] by requiring signatory contractors to purchase insurance from the designated carrier, is an unfair labor practice, unenforceable and void under § 8(e) of the National Labor Relations Act.[63] By its terms, § 8(e) forbids collective bargaining contracts whereby an employer agrees to cease to deal in products of another employer, or agrees "to cease doing business with any other person."[64]

Although § 8(e), "like other sections designed to curb secondary activity, does not shimmer with clarity,"[65] plaintiffs' and the Court's own research have failed to disclose any cases that hold that § 8(e) proscribes a contract similar to the one before this Court. Likewise, there is no authority from which principles may be drawn along the lines of plaintiffs' urging.

Before turning to judicial interpretation of § 8(e) relevant to the argument of the parties, there is a preliminary problem. It is possible the contract does not fit the letter of the statute. Section 8(e) might be read to prohibit agreements aimed at particular persons or a

---

61. *See* text accompanying note 46 *supra.*

62. *See* text accompanying note 21 *supra.*

63. 29 U.S.C.A. § 158(e) (1973). Plaintiffs allege in their amended complaint that the union "threatened, coerced, and restrained members of PECA" to enter into Article 19 and "to cease doing business with Plaintiffs and to cancel insurance policies with carriers, general agents, and solicitors other than those agreed upon by IBEW Local 1186." This activity, it is alleged, constitutes violation of § 8(b)(4)(ii) of the NLRA, 29 U.S.C.A. § 158(b)(4)(ii) (1973), but the plaintiffs ignored the cause of action in their motion for summary judgment and at oral argument. They did not present evidence of threats or coercion directed by the IBEW at PECA members or at other electrical contractors.

64. Section 8(e) provides: "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void . . . ." 29 U.S.C.A. § 158(e) (1973) (provisos omitted).

65. *NLRB v. National Maritime Union,* 486 F.2d 907, 911 (2d Cir. 1973).

definable group of persons.[66] The classification drawn by Article 19 does not appear to be aimed at particular persons or a definable group of persons, because the parties to the agreement did not contemplate who the outsiders would be, either by name or by characteristics. The contractors would merely "cease doing business" with all those who did ·not submit the lowest bid. However, since the defendants did not rely on that point, this Court will assume, without deciding, that "the words of § 8(e) unambiguously embrace"[67] Article 19, and examine the judicial gloss placed on the statute by some of the many courts faced with its enforcement.

The seminal Supreme Court case, *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), held that § 8(e) does not reach employees' primary activity but only reaches those agreements with "secondary" objectives. The Court and commentators agree that the core purpose of §§ 8(b)(4)(ii) and 8(e) is to outlaw union pressure directed at a *neutral employer* to induce it to cease doing business with an employer with whom the union is engaged in a *labor dispute, i. e.,* the classic "secondary labor boycott." *Id. passim.*[68] "Congress . . . meant to protect the employer only from union pressures designed to involve him in disputes not his own." *Id.* at 625–26, 87 S.Ct. at 1258. "[H]owever severe the impact of primary activity on neutral employers, it was not thereby transformed into activi-

ty with a secondary objective." *Id.* at 627, 87 S.Ct. at 1259.

*National Woodwork* involved a work-preservation agreement: a carpenters' union and an association of general contractors agreed that union members would not handle doors that were premachined in such a way as to eliminate some of the work traditionally done by union members at the job site. After discerning the Congressional intent to reach only "primary" activity, the Court recalled that a previous decision[69] sanctioned work-preservation clauses like the one involved in *National Woodwork*. The Court observed that it would "be incongruous to interpret § 8(e) to invalidate clauses over which the parties may be mandated to bargain." *Id.* at 642–43, 87 S.Ct. at 1267. The result would not only be incongruous; it would be inconsistent with Congressional intent to leave primary activity outside the scope of § 8(e).

Article 19 in the instant case passes the "primary" test and fails the "secondary" test. The principal primary activity of the entire labor law regime probably is bargaining over terms and conditions of employment. While there may be a split of authority as to whether the actual naming of the insurance carrier is a mandatory subject for bargaining, there is unanimity on the proposition that benefits, coverage, and administration of a health insurance plan are mandatory bargaining items.[70] Article 19 establishes a *method* for selection of a carrier which is intended to in-

---

66. *National Woodwork Mfr. Ass'n v. NLRB,* 386 U.S. 612, 619 & n. 4, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

67. 386 .U.S. at 619, 87 S.Ct. at 1255.

68. As the Court noted, most of the legislative history came from passage of § 8(b)(4)(A) and its successor § 8(b)(4)(B). Section 8 (e) was designed primarily to close various loopholes in the application of § 8(b)(4)(A), and its enactment "did not expand the type of conduct which § 8(b)(4)(a) condemned." *Id.* at 633–34, 87 S.Ct. at 1262.

69. *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

70. *Compare Bastian-Blessing v. NLRB,* 474 F.2d 49, 52 (6th Cir. 1973), *enforcing* 195 N.L.R.B. 1108 (1972) *and* 194 N.L.R.B. 609 (1971), *with Connecticut Light & Power Co. v. NLRB,* 476 F.2d 1079 (2d Cir. 1973) *enforcing* 196 N.L.R.B. 967 (1972); *see Medical Manors, Inc.,* 201 N.L.R.B. 188 (1973).

crease the quality of the benefits enjoyed by union members. The IBEW never insisted on a carrier by name nor is it interested in which carrier wins the competitive bidding. Therefore Article 19 resulted from primary bargaining activity, and is just as much within the rationale of *National Woodwork* as was the work-preservation agreement of that case.

Moreover, there is no secondary labor objective in the enactment of Article 19, unlike the cases cited *infra* or *Allen Bradley Co. v. Electrical Workers Local 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), in which the employer-union agreement was used as a "sword" to monopolize *other jobs* for union members. The IBEW has no interest whatsoever in labor relations of any employer in the insurance industry. It certainly is not involved in a labor dispute with any of them.

Plaintiffs seek comfort in *ACCO Construction Equipment, Inc. v. NLRB*, 511 F.2d 848 (9th Cir. 1975), *enforcing on this point* 204 N.L.R.B. 742 (1973); *NLRB v. National Maritime Union*, 486 F.2d 907 (2d Cir. 1973), *enforcing* 196 N.L.R.B. 1100 (1972); and *IBEW Local 1186*, 192 N.L.R.B. 254 (1971), *enforced sub nom. NLRB v. Pacific Electrical Contractor's Association*, 478 F.2d 853 (9th Cir. 1973).

In *ACCO Construction*, the agreement restricted the freedom of building contractors to utilize non-union repairmen (employees of the sellers of heavy equipment) for post-warranty service of equipment they had purchased. The union began to enforce the clause *coincident with a drive to organize the equipment dealers*, at which point the dealers brought charges. On appeal, the union's only contention was that the transaction came within the construction industry

proviso of § 8(e). The material factor of illegality in *ACCO Construction* was use of the agreement during the drive to organize the equipment dealers.[71]

*National Maritime* dealt with a contractual requirement that the employer's sale of any of its ships to another employer would be conditioned upon the purchaser agreeing to abide by the original employer's collective bargaining agreement with the union—whether or not the purchaser's employees were already represented by a rival union. The Second Circuit thus faced a contract that was a purported "work preservation" agreement, perhaps legal under *National Woodwork*, and an agreement that simultaneously appeared to be aimed at the labor relations of a secondary employer. 486 F.2d at 912.

The Board and the Second Circuit explicitly relied on the Supreme Court's primary/secondary analysis in *National Woodwork*, and determined that there was no *legitimate* work preservation objective. The Board determined the union's objective to be the illegal desire to force a purchaser into a union contract. Its opinion concluded:

> In these circumstances, these clauses place restrictions on sales which are not strictly "germane to the economic integrity of the principal work unit. . . ." Instead they only insure that the purchasing employer is under contract with the NMU.[72]

The Second Circuit in enforcing the Board's decision also looked beyond the union's claim that the clause was "aimed at the labor relations of the primary employer." *See* 486 F.2d at 912. As did the Board, the Court found that the real purpose of the clause illegally affected a secondary employer.

---

71. This issue was not discussed in the Ninth Circuit's opinion, of course, since the applicability of the body of § 8(e) was never challenged—merely whether the agreement was exempt under the construction industry proviso. *See* 204 N.L.R.B. 742, at 745.

Plaintiffs argue that, as in *ACCO Construction*, the construction proviso is inapplicable to defendants here. That point is immaterial.

72. 196 N.L.R.B. at 1101 (footnote omitted).

Plaintiffs' third case, *IBEW Local 1186*, involved an agreement that the employees would be assigned to work only on equipment and material owned by their employers, the electrical contractors. An issue was whether the contract required the contractors "to cease doing business with any other person," *e. g.*, those building owners who wished to retain ownership of electrical equipment being installed for them by the contractors' employees.

The Trial Examiner appeared to have applied a literal reading of § 8(e), insofar as he found "no direct evidence that the Union herein is seeking to affect or control the labor relations of any manufacturer of electrical equipment. Although such is usually an objective and consequence of contracts that violate Section 8(e) of the Act, that section outlaws *any* agreement to cease doing business with another employer . . . ." 192 N.L.R.B. 254, at 258.

The union business manger had testified that there were a few large jobs where the installation work was not done by union members. The challenged contract reached those situations, but also affected those people who wished to own the equipment and material *and* still hire unionized contractors. Unlike *National Woodwork*, where every "cessation of business" resulted in a corresponding preservation of work for the union members, the challenged agreement in *IBEW Local 1186* was overkill, and thus had *secondary effects:*

> The Union's dispute or grievance on work assignment herein is actually with those who assign installation work to employees who are not electricians and members of the Union. To prevent them from being in a position to do this, the Union is seeking to require *all* general contractors and building owners to cease buying their fixtures from any source other than electrical contractors. Thus, included therein are *employers neutral and secondary to the Union's dispute* with those who would assign installation work to others.

*Id.* (emphasis added). The Supreme Court in *National Woodwork* eschewed a literal reading of § 8(e). The Trial Examiner's anaysis in *OBEW Local 1186* does not depart from the Court's approach.

Plaintiffs urge this Court to test the *relative* merit of the primary interest in this case (bargaining over terms and conditions of workmen's compensation coverage) against the merits of those primary interests in the various cases above that have found § 8(e) violations. Since defendant union's interest here is less than the others', plaintiffs argue, it follows *a fortiori* that there is also a § 8(e) violation herein.

Not only is this Court not inclined to make a finding against the relative merits of the defendants' interests; the argument misses the point of *National Woodwork* and its progeny:[73] to constitute a § 8(e) violation, an agreement must have (at least) secondary labor objectives, in the fulfillment of which it affects neutral and secondary parties. The instant case does not have these ele-

---

73. In addition to the cases already cited, *see NLRB v. Muskegan Bricklayers Local 5*, 378 F.2d 859 (6th Cir. 1967) ; *Meat & Highway Drivers Local 710 v. NLRB*, 118 U.S.App.D. C. 287, 335 F.2d 709 (1964) ; *Orange Belt District Council 48 v. NLRB*, 117 U.S.App. D.C. 233, 328 F.2d 534, (1964) ; *Bakery Wagon Drivers Local 484 v. NLRB*, 116 U.S. App.D.C. 87, 321 F.2d 353 (1963) ; *District 9, IAM v. NLRB*, 114 U.S.App.D.C. 287, 315 F.2d 33, 36 (D.C.Cir. 1962) ; *NLRB v. Teamsters Local 107*, 300 F.2d 317 (3d Cir. 1962) ; *NLRB v. Teamsters Local 182*, 272 F.2d 85 (2d Cir. 1959).

Some of these cases dealt with §§ 8(b)(4)(A) or (B), but § 8(e) was intended to reach the same conduct. *See* note 68 *supra*. "Judicial decisions interpreting the broad language of § 8(b)(4)(A) of the Act uniformly limited its application to such 'secondary' situations." *National Woodwork Mfr. Ass'n v. NLRB*, 386 U.S. 612, 626, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). *See* cases and commentary cited Id. at 626 n. 16, 87 S.Ct. 1250.

ments. Since plaintiffs have not made out a *prima facie* case, they have no legal position from which to argue equities.

## CONCLUSIONS

Plaintiffs' Motion for Summary Judgment is denied; defendants' Motion for Summary Judgment is granted. Defendants will prepare the Order.