579 F.2d 484
 98 L.R.R.M. (BNA) 2415, 83 Lab.Cas. P 10,523,
1978-1 Trade Cases 61,967
 ACKERMAN-CHILLINGWORTH, DIVISION OF MARSH & McLENNAN,
INCORPORATED, a Delaware Corporation, Alexander of Hawaii,
Inc., dba Mid-Pacific Insurance Division, a Hawaii
Corporation, American Mutual Underwriters, Ltd., a Hawaii
Corporation, Bayly, Martin & Fay of Hawaii, Inc., a Hawaii
Corporation, Davies Insurance Agencies, Inc., a Hawaii
Corporation, Stanley S. Hashimoto, Occidental Underwriters
of Hawaii, Ltd., a Hawaii Corporation, Jack T. Osakoda, and
Raymond T. Tanaka, Appellants,
v.
PACIFIC ELECTRICAL CONTRACTORS ASSOCIATION, a Hawaii
non-profit Corporation, International Brotherhood of
Electrical Workers, Local No. 1186, PacificEmployers
Insurance Company, a California Corporation, the Insurance
Company ofNorth America, aPennsylvania Corporation, Walter
T. Oda, and Akito Fujikawa, Appellees.
 No. 76-1264.
 United States Court of Appeals,
Ninth Circuit.
 March 22, 1978.
Rehearing and Rehearing En Banc Denied July 31, 1978.
 
 William M. Swope (argued), Honolulu, Hawaii, for appellants.
 John A. Hoskins (argued), Benjamin C. Sigal (argued), Richard E. Stifel (argued), Honolulu, Hawaii, for appellees.
 Appeal from the United States District Court for the District of Hawaii.
 Before ELY, HUFSTEDLER, and WRIGHT, Circuit Judges.
 ELY, Circuit Judge:
 
 
 1
 This is a private antitrust action challenging a workmen's compensation plan, which was implemented by an employers' association pursuant to a collective bargaining agreement. The appellants alleged that the plan was both illegal Per se and unlawful as contrary to the rule of reason under section 1 of the Sherman Act, 15 U.S.C. § 1 (1970). The opposing parties moved for summary judgment, and the District Court granted the motion of the appellees, writing an excellent opinion, reported at 405 F.Supp. 99 (D.Hawaii 1975). Here, the appellants vigorously challenge the propriety of the order.[1]FACTS[2]
 
 
 2
 Appellants, who are general insurance agents and insurance solicitors in Hawaii, filed a complaint against the Pacific Electrical Contractors Association (PECA), a trade association, its executive secretary, one Oda, the International Brotherhood of Electrical Workers, Local 1186 (IBEW), its business manager, named Fujikawa, the Insurance Company of North America (INA), and the latter's wholly-owned subsidiary, Pacific Employers Insurance Company (PEIC). Of the approximately 120 electrical contractors in Hawaii, 63 are dues-paying members of PECA. PECA negotiates with IBEW on behalf of all the contractors, who, accordingly, have signed a collective bargaining contract with IBEW.
 
 
 3
 Prior to 1974 the electrical contractors purchased their insurance individually from a number of carriers through different agents. Hawaii's law permits employers in an occupational field to form "safety groups" for the purpose of purchasing their insurance from a single carrier. Haw.Rev.Stat. § 431-693(3) (1968). Safety groups have been extensively utilized in other states but were uncommon in Hawaii until the concept was introduced by the appellees.
 
 
 4
 Several characteristics of safety groups make their use attractive. First, the insurance carrier encourages cooperative efforts among employers, workers, and insurers aimed at reducing occupational hazards and improving employee rehabilitation programs. The increased effectiveness of such safety and rehabilitation programs promotes diminution of the amounts of premiums. Second, insurance purchased by members of a safety group is of the participating type; thus, dividends are payable at the end of the policy term. In the safety group context, insurance carriers are more likely to declare large dividends rather than risk losing business to a competitor. Third, and most significantly, all employers in a safety group are eligible to receive dividends, even though carriers generally do not pay dividends to small employers. This feature was particularly attractive to the electrical contracting industry, which consists largely of small employers.
 
 
 5
 In May, 1973, IBEW proposed to PECA that all Hawaii electrical contractors place their workmen's compensation insurance either with one carrier or through a Taft-Hartley trust fund. Union officials believed that either plan would benefit the employees by providing for better claims service through a centralized administration. In addition, a single insurer would likely have more incentive and a greater opportunity to upgrade safety and rehabilitation programs.
 
 
 6
 IBEW offered to PECA the option to manage such a workmen's compensation insurance plan at a meeting of PECA's Board of Directors held on May 23, 1973. Fujikawa, of IBEW, expressed concern about the financial condition of PECA. He suggested that electrical contractors would receive reduced rates under a group insurance plan and that PECA could supplement its income by charging electrical contractors a fee for administering such a plan. To secure the anticipated benefits for the union and PECA, Fujikawa and the PECA Board agreed that contractors who were not members of PECA should also be required to participate in the plan.
 
 
 7
 In September, 1973, Martin E. Segal Company (Segal), a consulting firm that had assisted PECA and IBEW in insurance matters, evaluated the IBEW proposal. In lieu of a Taft-Hartley trust fund, Segal recommended a dividend safety group plan called the "Association Dividend Group Plan." Under this plan the contractors would continue to pay premiums calculated according to the individual risks of their businesses, based upon considerations such as their type of work, volume of payroll, and safety record. Dividends would be computed, however, according to the record of the entire group of contractors. Segal estimated that total dividends under the proposed plan would exceed those that the contractors were currently earning.
 
 
 8
 Oda reported Segal's proposal to the PECA Board of Directors. He suggested earmarking a percentage of the dividends for an employee rehabilitation program. He also recommended that, in order to supplement the income of PECA, dividends be applied to PECA dues, "with the inference that non-members would be forfeiting their dividends."
 
 
 9
 PECA's Board of Directors and IBEW officials held a joint meeting on September 27, 1973, to discuss the Segal plan. The PECA directors agreed to recommend that its members adopt the "Association Dividend Group Plan," with the mandatory participation of all employers covered by the collective bargaining agreement.
 
 
 10
 On October 26, 1973, PECA convened a meeting of the general membership to discuss the proposed group plan and nonmember contractors were invited to attend the meeting. Berton Jacobson, representing Segal, explained the features of the proposed plan, including its mandatory character and the distribution of dividends. He projected an overall fifteen percent savings in premiums under the group plan. The membership approved an amendment to the collective bargaining contract that required participation of all signatory contractors, with the plan administered by PECA. The amendment read:
 
 ARTICLE XIX WORKMEN'S COMPENSATION
 
 11
 Section 1. The parties agree that present practices and procedures for compensation of employees for occupational illness and injuries are unsatisfactory, and require substantial improvement.
 
 
 12
 Section 2. The parties agree that all Employers will participate in an "Association Dividend Group Plan" providing for workmen's compensation insurance coverage for their employees, as recommended by the actuary designated by the parties. The Plan will be administered by PECA. The Union shall be consulted by PECA prior to making any important policy decisions which may affect the employees.
 
 
 13
 Section 3. The Plan shall be initiated February 1, 1974.
 
 
 14
 During the following weeks a number of insurance carriers and agents expressed to Oda their disapproval of the mandatory nature of the plan. In a letter to Jacobson, Oda wrote, "I'm still getting calls from sub-agents who feel we will be putting them out of the workmen's compensation business."
 
 
 15
 On November 19, 1973, Segal sent a specification letter to nine insurance carriers to solicit bids for the PECA plan. The letter requested written proposals concerning promptness of claims payments, safety and rehabilitation programs, and dividend payments. It did not specify a general agent or whether the plan would be "open" or "closed" in the sense that only one or a limited number of agents could represent the carrier. In a letter written on the same day, Jacobson warned Oda to furnish the specification letter only to direct representatives of carriers not to agents or brokers, who might claim an entitlement to compensation for their services.
 
 
 16
 Only three insurance companies submitted bids: First Insurance Company of Hawaii, Argonaut Insurance Company, and INA. The First Insurance Company bid, which one White of Segal rejected, "require(d) the free choice of an insurance agent by the insured," and offered a dividend plan "applicable to individual risk, with the amount of the dividend being determined on the basis of that risk's premium size and experience." White testified that the bid was rejected because it did not contain a group dividend plan, as requested in the specification letter.[3]
 
 
 17
 Segal recommended the INA plan, and the PECA Board of Directors accepted that plan on January 24, 1974.[4] INA proposed to write the policies through PEIC, its subsidiary. INA quoted a minimum retention rate of 31.9 percent, which was more favorable than the 40.8 percent retention quoted by Argonaut Insurance Company. INA stated in its proposal that it would acquiesce to the appointment of a broker to coordinate the plan if PECA so desired.
 
 
 18
 Oda had been licensed as an insurance solicitor since 1957 but was inactive for a number of years before the implementation of the group plan. In order to supplement PECA's income, PECA intended that Oda should serve as agent of record[5] for the group plan and contribute his net commissions to PECA to defray some of the costs of administering the plan. The Yamada Insurance Agency, Ltd., for whom Oda solicited, entered into a nonexclusive general agency agreement with INA. The agreement authorized Yamada to solicit, accept, and bind risks for INA and PEIC. Consequently, all policies sold by Oda under the group plan were written by Yamada.
 
 
 19
 Oda wrote to all the signatory contractors on January 31, 1974, reminding them that the amended collective bargaining agreement required participation in the group plan and soliciting their applications for INA policies. Oda asked that each contractor notify him as to the expiration date of its current workmen's compensation policy. The contractors were permitted to retain their current coverage until its expiration, at which time their procurement of an INA policy would be required.
 
 
 20
 During the next eleven months, Oda sent numerous follow-up letters to the contractors who had not yet acquired a group plan policy. The appellants alleged that Oda, with his aggressive solicitation tactics, coerced contractors to purchase PEIC policies through him. The record does not support that claim. It is true that Oda firmly told contractors that they could not renew their coverage with their present carriers and that it was necessary that they purchase a PEIC group policy. This was his responsibility as business manager of PECA. While he encouraged the contractors to obtain their policies through him, it was evident that he never told any contractor that the contractor must deal through him rather than through another insurance solicitor.
 
 
 21
 From the inception of the group plan, INA insisted that the plan should remain "open," insofar as to permit any agent representing INA/PEIC to issue policies to signatory contractors. Yamada's president advised one of the appellants, Bayly, Martin and Fay (BMF), a general agent, that BMF could issue policies. PEIC appointed BMF a general agent in August, 1974, but by that time one of the firm's clients had already switched to the PECA plan through Oda.[6]
 
 
 22
 Oda objected to the stance of INA because he feared a loss in his net commissions, which PECA would receive for application to its expenses of administering the group plan. In written communications to the PECA Workmen's Compensation Committee, the PECA Board of Directors, and Jacobson, Oda characterized the use of other agents as discriminatory in nature. Oda's views, however, did not have any apparent influence upon the terms of the collective bargaining agreement, which did not require that Oda handle the policies, or upon the practices of Yamada, PEIC, or INA.
 
 
 23
 Shortly thereafter, Atlas Insurance Agency, Ltd., requested that it serve as agent of record under the group plan, with contractors having the right to a free choice of agents. Oda and PECA summarily rejected the proposal because it would have eliminated PECA's supplemental income.
 
 
 24
 Two insurance agents other than oda, one of them the parent company of an appellant, sold PEIC insurance to signatory contractors in 1974 and 1975. Between February 1, 1974, and June 20, 1975, 114 of the 128 signatory contractors bound by the collective bargaining contract placed their PEIC insurance policies through Oda and Yamada.
 
 JURISDICTION
 
 25
 IBEW and Fujikawa contend that we lack jurisdiction under 28 U.S.C. § 1292(a) (1) (1970) because the District Court's order was not interlocutory. They urge that the order was final because it disposed of the entire claim of appellants and, moreover, that no jurisdiction attached under 28 U.S.C. § 1291 (1970) because appellants failed to secure the certificate of final judgment prescribed by Fed.R.Civ.P. 54(b).
 
 
 26
 Appellants support their argument with isolated language from In re Merles, Inc., 481 F.2d 1016, 1018 (9th Cir. 1973):
 
 
 27
 An interlocutory order or decree is one which does not finally determine a cause of action but only decides some intervening matter pertaining to the cause, and which requires further steps to be taken to adjudicate the cause on the merits.
 
 
 28
 The Merles decision, however, is not germane to this case. In Merles we held that an order of the bankruptcy court, disapproving a compromise of a claim of the bankrupt's estate against a secured creditor, was not a final judgment for purposes of appellate review under 11 U.S.C. § 47(a) (1970).
 
 
 29
 We hold that we do have jurisdiction under section 1292(a)(1). Appellants requested injunctive relief in their complaint, which the District Court denied. Moreover, the District Court order is interlocutory for purposes of appellate review since Oda and PECA's counterclaim under the Sherman Act remains pending. Whenever a court fully adjudicates a claim for an injunction and does not execute a Rule 54(b) certificate, the adjudication is interlocutory if other claims remain pending. Hartford Fire Insurance Co. v. Herrald, 434 F.2d 638, 639 (9th Cir. 1970); Rains v. Cascade Indus., Inc., 402 F.2d 241, 243 (3d Cir. 1969); Ronel Corp. v. Anchor Look, Inc., 312 F.2d 207, 208 (9th Cir. 1963).
 
 THE PER SE RULE SHERMAN ACT § 1
 
 30
 The appellants alleged that the requirement of the collective bargaining contract that all signatory contractors provide workmen's compensation insurance through the "Association Dividend Group Plan" constitutes a group boycott that is illegal Per se. See United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, Inc.,359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Thus, their position is that the arrangement violated section 1 of the Sherman Act regardless of the arrangement's economic effects or the motivations of the appellees.
 
 
 31
 The District Court rejected appellants' argument, reasoning that IBEW and PECA did not refuse to deal with insurance carriers, that insurance agents were not precluded from writing PEIC group policies, and that, even assuming Arguendo that "an Implicit agreement existed to use Oda exclusively, there would still not be a Per se violation of § 1." 405 F.Supp. at 109 (emphasis in original).
 
 
 32
 In reviewing the propriety of the District Court's summary judgment in a complex antitrust case, we look at the record in the light most favorable to the appellants, here, the parties opposing the motion for summary judgment that was granted. Poller v. CBS, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). We nevertheless conclude that the record could not support a finding that appellees committed a Per se violation of section 1.
 
 
 33
 First, appellants criticize the requirement that all contractors use one insurance carrier, but this feature cannot stigmatize the group plan as a boycott. Appellees solicited competitive bids from nine insurance companies, and it is not alleged that they refused to deal with other insurers. Furthermore, appellants, who are insurance agents and solicitors, have not demonstrated how the sole carrier requirement may have done harm to them.
 
 
 34
 The second theory presented by appellants is that Oda's underwriting of policies constituted a boycott of insurance agents such as themselves. Appellants stress particularly the mandatory nature of the group plan and Oda's backing and success in soliciting policies, suggesting that appellants were thereby precluded from also soliciting the workmen's compensation policies.
 
 
 35
 It was the legitimate desire of PECA and IBEW that Oda should write as many of the INA/PEIC policies as possible. Oda had made a very attractive offer to PECA and the contractors, I. e., he would use his net commission income to offset PECA's cost of administering the group plan. It was in the self-interest of the individual PECA-member contractors to purchase their insurance through Oda in order to reduce the expenses of PECA. Moreover, Oda aggressively solicited the business of all the signatory contractors, both members and nonmembers of PECA. He persistently reminded recalcitrant contractors that their labor agreement required that they purchase PEIC workmen's compensation insurance, sending them applications for insurance to be processed through him.
 
 
 36
 There is, however, no support whatsoever in the record for appellants' contention that the appellees coerced contractors to deal only with Oda.[7] The labor agreement did not specify that only Oda could solicit the contractors' business, and the appellants presented no evidence that any contractor believed that he could not purchase a PEIC policy through the agent of his choice. At numerous times, INA made it clear that any INA agent could write policies for the contractors, and INA even appointed one of the appellants as an agent. It is true that Oda, for obvious good reasons, sold the vast majority of the contractors' policies, but it is also true that other agents did, in fact, sell some of the policies.
 
 THE RULE OF REASON SHERMAN ACT § 1
 
 37
 Appellants' next line of attack under the Sherman Act is that, under the "rule of reason," section 1 condemns the group insurance plan. The rule of reason prohibits every contract, combination, or conspiracy that significantly restrains competition. Standard Oil Co. v. United States, 221 U.S. 1, 59-60, 31 S.Ct. 502, 55 L.Ed. 619 (1911); See United States v. Topco Assocs., Inc., 504 U.S. 596, 606-07, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Whether a particular restraint unduly suppresses competition depends upon the facts peculiar to the business in which the restraint is applied, the nature and history of the restraint, its probable effect, and the reasons for which it was adopted. Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).
 
 
 38
 The complaint of appellants is that Oda's role in the group plan, coupled with the mandatory requirement that all signatory contractors to the collective bargaining agreement participate in the group plan, prevented the appellants from competing with Oda for the contractors' insurance business. In particular, they stress Oda's return of commissions to PECA and his efforts to ensure the compliance of the contractors with the collective bargaining agreement as features of the arrangement leading to Oda's success at their alleged expense.[8]
 
 
 39
 The District Court ably explained the considerations that motivated IBEW and PECA to implement the group plan:
 
 
 40
 The IBEW initiated its proposal for a change in the method of purchasing insurance in order to create opportunities for better claims service for its members, more effective safety plans, and better rehabilitation programs. The PECA eventually agreed to the group-plan approach because it saw several direct benefits for electrical contractors in addition to the direct benefits to its employees. Better safety and rehabilitation programs could reduce premiums. Group purchasing could lead to lower retentions by the carriers. Group evaluation of dividends could make all contractors eligible to receive dividends regardless of the size of their individual premiums, increasing total dividends. Commissions earned by Oda and credited to the PECA could cover expenses incurred in administration of the plan, as well as eventually lead to reduced premiums through a negotiated lower commission.
 
 
 41
 405 F.Supp. at 110. In essence, PECA sought to obtain a better product, insurance, at a lower cost, a goal that would appear to enhance, rather than diminish, competition among suppliers of that product. Oda's underwriting of the policies furthered a salutary objective.
 
 
 42
 Appellants attack the professed purpose of appellees as a purpose designed to disguise sinister, monopolistic intentions. They have, however, presented no evidence of any such anticompetitive motivation on the part of IBEW, PECA, Oda, PEIC, or INA. In this respect, this case resembles Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 78 (9th Cir. 1969), Cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), wherein our Brother Duniway wrote:
 
 
 43
 Nothing in the record suggests, much less would support an inference, that (defendant's) purpose was to eliminate or damage plaintiff, or to force it to comply with unlawful demands, rather than to get better distribution of Seagram and Barton products. . . . Surely, this is the essence of competition. Surely, liability for treble damages should not be based on such second guessing of business judgment by a jury.
 
 
 44
 In applying the rule of reason, our analysis does not end with an examination of purpose. Even though the purpose of a trade practice is innocent or benign, it may be unreasonable if it is substantially harmful to competition. E. g., Helix Milling Co. v. Terminal Flour Mills Co., 523 F.2d 1317, 1322 (9th Cir. 1975), Cert. denied, 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976); Rex Chainbelt Inc. v. Harco Prods., Inc., 512 F.2d 993, 1006 (9th Cir.), Cert. denied, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975). Here, the decision that Oda should underwrite policies surely may have deprived the appellants of some business. Yet it cannot be said that this fact alone corrupted the plan to the extent that it constituted an unreasonable restraint of trade. The Sherman Act protects competition, not competitors who may suffer some pecuniary harm because of the competitive process. A contrary decision would stand the Act on its head. Overall, the group insurance plan, with its competitive bidding, dividend plan, and employee safety and rehabilitation programs, increased competition in Hawaii's insurance market. See 405 F.Supp. at 111. Appellants' losses resulted from the initiative taken by appellees in developing a better plan for workmen's compensation insurance, not from any artificial impediments to appellants' ability to do likewise or to otherwise compete in a reasonable way.
 
 
 45
 Furthermore, the appellants are not presently precluded from competing with Yamada and Oda. As we have already noted, INA has indicated that other insurance agents may write group policies for contractors, and it has already licensed one of the appellants for that purpose.
 
 CONCLUSION
 
 46
 The appellants have raised a variety of other issues, but we do not reach them on this appeal. For the first time, they claim on appeal that the appellees have violated section 2 of the Sherman Act, 15 U.S.C. § 2 (1970), by monopolizing and attempting to monopolize the sale of workmen's compensation insurance to Hawaiian electrical contractors. There were no allegations of section 2 violations in the complaint, but the District Court explored the possibility that appellants' motion for summary judgment could be construed to present a section 2 claim. See 405 F.Supp. at 112. We decline to address the issue because of its insufficient development in the trial court.
 
 
 47
 The District Court also determined that neither IBEW nor PECA were immune from antitrust liability because of the nonstatutory labor exemption, but that INA and PEIC were immune under the McCarran-Ferguson Act, 15 U.S.C.A. §§ 1011-1015 (1970). 405 F.Supp. at 113, 114. In view of our decision that the District Court properly granted summary judgment for appellees on the antitrust issues, we do not review these rulings.
 
 The order of the District Court is
 
 48
 AFFIRMED.
 
 
 49
 HUFSTEDLER, Circuit Judge, concurring and dissenting:
 
 
 50
 I concur in my brothers' conclusion that the insurance companies were entitled to judgment in their favor. I cannot agree that the remaining defendants were entitled to judgment because the existence of triable issues of material fact foreclosed that conclusion.
 
 
 51
 The gravamen of plaintiffs' complaint is that the defendants combined to coerce the electrical contractors of Hawaii, especially the non-members of the defendant electrical contractors' trade association, to purchase their workmen's compensation insurance through a single agent, defendant Oda. The combination virtually excluded plaintiffs from becoming insurance agents in the electrical contractors' market for workmen's compensation policies. The pleadings adequately averred a Per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1) unless the defendants' program was immunized from antitrust liability either by the McCarran-Ferguson Act (15 U.S.C. §§ 1011-15) or by the so-called non-statutory labor exemption. Immunity under the former Act does not exist if the defendants used coercion in furtherance of their plan. Moreover, immunity under the non-statutory labor exemption does not exist unless Oda's role as sole agent of record was strictly necessary for the survival of the plan. The record reveals that triable issues of fact exist both in determining the existence or non-existence of coercion and in deciding whether the designation of a sole agent was essential to the survival of the plan. Accordingly, I would reverse the district court's judgment and remand the case as to all defendants, other than the insurance carriers, for trial on those two issues.
 
 
 52
 Defendant Local 1186, International Brotherhood of Electrical Workers (IBEW), whose business manager is defendant Akito Fujikawa, represents employees of electrical contractors in the State of Hawaii. Defendant Pacific Electrical Contractors Association (PECA), whose executive secretary is defendant Walter Oda, is the trade association of the Hawaiian electrical contractors. When this claim arose, 63 of the 128 electrical contractors in Hawaii were dues-paying members of PECA. PECA negotiated with IBEW on behalf of all the electrical contractors in Hawaii. Their collective bargaining agreement covered the entire industry in the state. The remaining defendants are the Insurance Company of North America (INA), and its wholly-owned subsidiary, the Pacific Employers Insurance Company (PEIC), carriers of workmen's compensation insurance.
 
 
 53
 Plaintiffs are general agents and solicitors of insurance in Hawaii. General agents are companies authorized by insurance carriers to solicit applications for insurance and effectuate contracts. Solicitors are salesmen appointed by general agents to solicit insurance applications and to collect premiums on a commission basis. (See Haw.Rev.Stat. §§ 431-361, 431-363.)
 
 
 54
 During the course of the renegotiation of the IBEW-PECA collective bargaining agreement in the spring of 1973, the union proposed that the contractors change the method by which they obtained workmen's compensation insurance. Instead of having each contractor individually purchase insurance from one of the 22 carriers and through one of the 20 agencies servicing the electrical contractors' industry, IBEW urged that insurance be provided either through a Taft-Hartley trust fund, which would have effectively made the contractors self-insurers, or from a single carrier. After receiving the report of the Martin E. Segal Company (Segal), a consulting firm, IBEW discarded the trust fund idea and recommended the adoption of a "safety group" plan. Under the plan, insurance would be purchased centrally from one carrier. Premiums would be paid individually by each contractor according to the special experience of his business, but dividends would be calculated according to the safety record of the employers as a group. In September, 1973, IBEW officials met with the PECA Board of Directors, and the PECA directors agreed to recommend that the association's members adopt the safety group plan and mandate the participation of all employers covered by the collective bargaining agreement. In October, the membership of PECA met and approved the adoption of an amendment to Article XIX of the collective bargaining agreement establishing the safety group ("Association Dividend Group Plan") and requiring participation of all electrical contractors in the plan to be administered by PECA.
 
 
 55
 PECA and IBEW developed this insurance package in response to a variety of concerns. The union apparently believed that centralized administration of insurance would lead to better claims service through increased industry leverage with a single carrier and that a single insurer would have the incentive and the opportunity to create adequate safety and rehabilitation programs. The group plan was also expected to benefit the contractors. Insurance carriers were considered more likely to vote favorable dividends because of the large volume of business at stake, and the group calculation and payment of dividends meant that small employers, who paid premiums below the threshold hitherto necessary to entitle them to dividends, would now receive dividends. Segal predicted that total dividends under the plan would be 15 percent greater than the sum of the dividends the contractors were receiving individually.
 
 
 56
 However, the welfare of the employees and the contractors were not the IBEW's or the PECA's only interests. One of IBEW's purposes was to provide PECA with an additional source of income, particularly one which would enable the association to tithe non-member contractors. When faced with PECA's initial reluctance to accede to the single-carrier proposal, IBEW argued that the association could supplement its income by charging non-members a fee for administering the plan.[1] The dividends which the safety group plan would make available were soon seen as a means of supplementing PECA's income while penalizing contractors who continued to adhere to their non-member status. According to Oda, "Blackie's idea was to off-set dues payments by dividends and the non-members be required to forfeit their dividends since no credit can be extended towards dues contribution."[2] Dividends were not guaranteed and would not begin to be generated until a year or two after the plan was implemented. As Oda acknowledged, there was a serious "question of illegality in the allocation of dividends to dues, especially the forfeiture of dividends by non-members."
 
 
 57
 In contrast, commissions from the insurance carrier to the agent or solicitor are paid when premiums are paid by the insured. Commissions were guaranteed regardless of the safety record of the industry and would be available from the outset of the plan. A reasonable estimate of anticipated income could be made because premiums are prepaid. Oda had been a licensed insurance solicitor since 1957, although he was inactive during the years prior to the adoption of the safety group plan. IBEW and PECA proposed that Oda be made "agent of record" for the contractors' workmen's compensation insurance under the plan. Using his Yamada Insurance Agency, Ltd., Oda would write and sell group plan policies. The commissions he received, after taxes, would be paid over to PECA. PECA thus would receive the income of the insurance agent operating over the entire Hawaiian electrical contractors' industry, association members and non-members alike.
 
 
 58
 The union was solicitous of the welfare of the trade association, and it was convinced that an important aspect of the group plan was that it would provide PECA with sorely-needed income. When Fujikawa first broached the subject with PECA directors, in May, 1973, he prefaced his proposal by "express(ing) the concern that the PECA is going broke." (Minutes of May 23 meeting, Supra.) IBEW's concern for the health of PECA and its willingness to help PECA financially through the joint development of the plans and through payments by non-member contractors predated the insurance controversy. In proposing the group plan, Oda wrote the IBEW local that the plan would "in some small measure, 'atone' for having promised us an Industry Promotion Fund, having it specified in the contract, but only to be overridden by the International Office (of the union). It was intended to use the Promotion Fund concept to supplement our income as well as to assess the non-members their 'fair share' in managing this organization." (October 19 Letter to Jacobson, Supra.) PECA and Oda were also aware that the trade association was in precarious financial shape and that the safety group plan might relieve that condition:
 
 
 59
 "One of the incentive(s) for the PECA to undertake the program is supplemental income to off-set the declining reserves. Since the plumbers and sheet metal associations severed their affiliation with us two years ago, we have not been able to generate sufficient income to overcome the deficit."
 
 
 60
 (Letter of Oda to Jacobson, October 8, 1973.)
 
 
 61
 Amended Article XIX of the IBEW-PECA collective bargaining agreement said nothing about choosing insurance agencies to service the group plan or about the number of such agencies there would be. But it is apparent that IBEW and PECA contemplated that the workmen's compensation program would be set up as a "closed," rather than an "open" plan. "A closed program is one which has a single broker of record or agent precluding participation by any other agent or broker even though the other agent or broker might represent the same insurance company." (405 F.Supp. 99, 103.) Under an open plan any local agent or broker representing the carrier may place individual accounts within the program. (Id.) While it appears that all of the insurance in one workmen's compensation safety group plan must be written by one company, there is nothing in the nature of such a program that requires that all of the insurance be written through a single insurance agent. As a PEIC vice president wrote to an official of the company's San Francisco Service Office, "(a)ll of our Safety Groups are 'open' groups meaning that any properly licensed producer can place business in the group subject to our internal requirements." (Letter of Frank C. Collins, Vice President-Underwriting, to Donald Fey, March 8, 1974.) Neither INA nor PEIC saw any reason to mandate a closed group plan to assure the success of the program. On the contrary, upon notification of the PEIC's selection as the carrier for the electrical contractors' group plan, an INA official wrote to Segal "to go on record indicating that the above group will be an 'open' group as all our safety groups are." (Letter of Elmo Aghabeg, Manager, Workmen's Compensation Dep't, INA, to Jacobson, February 1, 1974.)
 
 
 62
 Despite the silence of the collective bargaining agreement, the opposition of INA/PEIC, and the lack of any structural need for a "closed" plan in the development or implementation of the safety group program, Oda responded to the financial imperatives of PECA and treated the plan as "closed." Benefiting from the symbiotic nature of his double role as executive secretary of PECA (and hence the administrator of the safety group, as designated by the union contract) and insurance solicitor, he wrote all of the signatory contractors on January 31, 1974, advising them that the terms of the new Article XIX of the collective bargaining agreement required their participation in the safety group plan. He sent them applications for INA policies and told them to return the completed applications to him. He asked that each contractor notify him as to the expiration date of its current workmen's compensation policy, and he sent numerous follow-up letters to the contractors who had not yet acquired group plan policies. Plaintiffs contend that Oda coerced contractors into purchasing INA/PEIC policies through him. Defendants characterize Oda's activities as nothing more serious than "aggressive solicitation," and they argue that while Oda advised contractors that the bargaining agreement required use of INA/PEIC as the carrier, Oda never told contractors that they had to buy their insurance through him. Whether or not the plan was technically "closed," Oda and PECA actively opposed allowing other insurance agents to write INA policies under the group plan. Trenor Thompson, the president of Bayly, Martin & Fay of Hawaii, Inc. (BMF), one of the plaintiffs herein and a licensed INA agent, attested that in June, 1974, a PECA representative told him that he "would not be allowed to sell or service workmen's compensation insurance business with any of the signatory contractors to the labor agreement . . . regardless of whether such insurance was placed with (PEIC)." (Affidavit of Trenor Thompson.) When INA subsequently affirmed that BMF would be allowed to process workmen's compensation insurance for Hawaiian electrical contractors, a Yamada official told BMF that its existing INA appointment was not enough and that an additional appointment from the PEIC was required. (Deposition of Thomas Takamune, President of Yamada.) According to BMF, by the time it was able to obtain that appointment, it had lost a client under the PECA plan to Oda and Yamada. Similarly, in July, 1974, Oda and PECA summarily rejected the proposal of Atlas Insurance Agency Ltd. that it also serve as agent of record under the group plan, with contractors having the right to choose freely between them. This was unacceptable, Oda wrote, because it "would defeat our secondary objective of using the earned commissions, less general excise and personal income taxes, to pay for part of our expenses."
 
 
 63
 Although a few agents other than Yamada/Oda did manage to sell INA/PEIC workmen's compensation insurance policies to electrical contractors, Oda's success in implementing a safety group plan effectively closed to all agents other than himself is manifest: Between February 1, 1974, and June 20, 1975, all but 14 of the 128 contractors bound by the IBEW-PECA collective bargaining agreement placed their INA/PEIC policies through Oda's Yamada agency.
 
 
 64
 * If the plaintiff's antitrust attack were based upon a challenge to the single-carrier aspect of the safety group plan, I would share both the district court's and my colleagues' reluctance to endorse plaintiffs' assault on the plan. The plan has obvious benefits for both contractors and employees, open bidding was used for the selection of the single carrier, and several hundred such programs presently exist in the United States. Plaintiffs' attack, however, is not on the single carrier feature of the plan, but on defendants' alleged agreement to use Oda as the single agent.
 
 
 65
 Plaintiffs' contention is that the defendants combined to make Oda the sole insurance agent for all of the electrical contractors in Hawaii for the purpose of providing PECA with income from commissions generated by the sale of the policies to all of the contractors, PECA members and non-members alike. They also claim that the defendants effectuated their "closed" plan by coercive means, such as threatening non-member contractors with IBEW reprisals if the non-members failed to authorize Oda to process their INA/PEIC applications. The result was, according to the plaintiffs, that they were denied access to the non-PECA contractors' market for INA/PEIC workmen's compensation policies.
 
 
 66
 Market foreclosure and coercion are the classic elements of a violation of Section 1 of the Sherman Act; collaborative conduct characterized by these factors is Per se unlawful under the Act. (See, e. g., United States v. General Motors Corp. (1966) 384 U.S. 127, 86 S.Ct. 1321, 13 L.Ed.2d 415; Radiant Burners, Inc. v. Peoples Gas Light & Coke Co. (1961) 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; Klor's Inc. v. BroadwayHale Stores, Inc. (1959) 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; Helix Milling Co. v. Terminal Flour Mills Co. (9th Cir. 1975) 523 F.2d 1317, 1320-21; E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee (5th Cir. 1972) 467 F.2d 178, 186-87; 11 J. Von Kalinowski, Antitrust Laws and Trade Regulation 76.02, at 76-11 to 76-12 (1977); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 872-79 (1955).)
 
 
 67
 The collaborative conduct attacked does not fit snugly within any of the more familiar kinds of group boycotts. (405 F.Supp. 99, 107-08.) The combination being challenged is unusual and the imposition by a trade association and a union of a "closed" agency plan in the context of an insurance safety group program is novel. But the Sherman Act is "couched in broad terms . . . adaptable to the changing types of commercial production and distribution that have evolved since its passage." (United States v. E. I. duPont de Nemours & Co. (1956) 351 U.S. 377, 386, 76 S.Ct. 994, 100 L.Ed. 1264.) No "all-fours" resemblance to arrangements previously held unlawful is necessary when the challenged combination is marked by the indicia of Per se illegality:
 
 
 68
 "The distinguishing feature of the group boycott cases is group action to coerce third parties to conform to the pattern of conduct desired by the group. . . . Such action offends the concept of a free market because it places involuntary restraints on the trading opportunities of strangers to the group."
 
 
 69
 (Barber, Supra, 103 U.Pa.L.Rev. at 875.)
 
 
 70
 In this case the "group" is composed of the defendants; the third parties coerced are the non-member contractors who, plaintiffs contend, were compelled to buy their INA/PEIC policies from Oda's Yamada agency; and the "strangers" whose trading opportunities have been restrained by defendants' activities are the plaintiff insurance agents who were denied access to the non-member contractors' market for workmen's compensation policies. As the Fifth Circuit has observed, "the touchstone of Per se Illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade,' and have fallen victims to the Per se rule." (E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, supra, 467 F.2d at 187.) Plaintiffs contend that both exclusionary and coercive conduct on the part of the defendants are present. If they are right, Per se illegality follows.
 
 
 71
 Although the interrelationships of the defendants and the context are unusual, the defendants' arrangement nevertheless resembles combinations that are characteristic of vertical boycotts. The district court found that there was no "vertical combination among INA at one level, and IBEW/PECA at the other, to exclude from the market one of their competitors." (405 F.Supp. at 108.) The district court apparently assumed that PECA was merely a trade association of electrical contractors which was not in competition with general agents in the insurance field. However, under the circumstances of this case, PECA was not just a trade association, nor was Oda simply a trade association's executive secretary. Within the structure of the safety group, Oda was an insurance solicitor selling INA/PEIC workmen's compensation policies to 114 of the 128 electrical contractors. PECA, as recipient of Oda's commissions, in a very real sense was in the insurance agency business. IBEW had a stake in PECA's fiscal welfare, and it was at least an incidental beneficiary of Oda's insurance sales.
 
 
 72
 PECA was not merely the passive beneficiary of the fortuitous circumstance that its executive secretary possessed an insurance solicitor's license and a generous disposition toward his employer which led him to give it his commissions. Rather, the evidence demonstrates that PECA and IBEW implemented the plan with the idea that Oda would act as an insurance agent and turn over his commissions to the association; that PECA, through Oda, could use its position as administrator of the plan to maximize its insurance commission income by telling contractors (especially non-members of the association) to take out INA/PEIC policies through Oda using the leverage of the collective bargaining agreement. Oda/PECA were in both the electrical contractors' field and in plaintiffs' insurance solicitation business. This curious double role was used to promote their competitive position in the safety group insurance sales' market.
 
 
 73
 Once it is recognized that, through Oda, PECA was in the insurance sales business, the resemblance of this arrangement to the classic vertical boycott model emerges. In Klor's Inc. v. Broadway-Hale Stores, Inc., supra, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, plaintiff Klor's, a small retail appliance store, charged that Broadway-Hale, a department store chain, had used its " 'monopolistic' buying power" to obtain the agreement of the major manufacturers and distributors of appliances not to sell to Klor's, or to sell to it only at discriminatory prices. This foreclosure of one business by another from a market they both sought was held to be Per se unlawful, because both the business excluded and the other businesses would no longer have the opportunity to deal with it:
 
 
 74
 "Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever." (359 U.S. at 212-13, 79 S.Ct. at 710.)
 
 
 75
 Klor's and Broadway-Hale were in competition for the purchase of appliances. Here, PECA, through Oda and with the support of IBEW, is in competition with plaintiffs in the sale of INA/PEIC workmen's compensation policies to members of the safety group. Defendants' combination has effectively driven plaintiffs out of business as insurance agents with respect to the contractors' workmen's compensation policies, and it has deprived the contractors especially those who are not members of PECA and therefore lack any stake in providing the association with additional sources of income of their freedom to buy their INA/PEIC policies from the agents of their choice.
 
 
 76
 If proved, the twin evils of coercion and market foreclosure would together be sufficient to render defendants' arrangement Per se unlawful. The district court appeared to assume that there was an implicit agreement to use Oda as the exclusive agent under the group plan (405 F.Supp. at 109), but it held that no Per se violation existed because the impact on plaintiffs was unintentional. It was the incidental result of the otherwise salutary group plan, and not the product of an anticompetitive motive. Applying Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd. (9th Cir. 1969) 416 F.2d 71 (agreements having the effect of excluding a party from a market are not Per se unlawful where the exclusion was a "merely incidental result" of actions aimed at attaining a legitimate business objective), the district court found that the "closed" agency arrangement presented no Per se violation and proceeded to test it according to the "rule of reason."
 
 
 77
 By its very terms, however, Hawaiian Oke is inapposite. In Hawaiian Oke, two liquor manufacturers agreed that in order to obtain improved distribution services, they would transfer their exclusive distributorships from the plaintiff to another distributor. We held that that agreement was not a Per se violation of the Sherman Act. The holding in Hawaiian Oke was contingent on the finding that defendants' agreement had no "adverse purpose or effect on competition." (416 F.2d at 78.) A combination which is anticompetitive in purpose or effect, however, does constitute an unreasonable restraint of trade in violation of the Sherman Act. (See, e. g., Fount-Wip, Inc. v. Reddi-Wip, Inc. (9th Cir. Feb. 6, 1978) 568 F.2d 1296, 1300-1301; Mutual Fund Investors, Inc. v. Putnam Management Co. (9th Cir. 1977) 553 F.2d 620, 626; Bushie v. Stenocord (9th Cir. 1972) 460 F.2d 116, 119.)
 
 
 78
 Plaintiffs here contend that defendants' combination was anticompetitive both in effect and in intent. The exclusionary effects of defendants' activities are clear: only 14 of the 128 electrical contractors in Hawaii bought their INA/PEIC insurance from an agent other than Oda. Bearing in mind the Supreme Court's admonition that "(e)limination, by joint collaborative action, . . . from access to the market is a per se violation of the (Sherman) Act" (United States v. General Motors Corp. (1966) 384 U.S. 127, 145, 86 S.Ct. 1321, 1330, 13 L.Ed.2d 415), we have been particularly sensitive to the antitrust implications of agreements which have resulted in the virtual exclusion from the relevant market of those businesses which are not parties to the challenged combination. (See, e. g., Helix Milling Co. v. Terminal Flour Mills Co., supra, 523 F.2d at 1320-22.)
 
 
 79
 The exclusionary effect of defendants' combination was not the incidental consequence of actions designed to attain the legitimate business objective of the safety group. As INA has reiterated in its communications to Segal, Oda and PECA, a closed agency arrangement is not a prerequisite for the success of a safety group, most safety groups are in fact "open," and INA apparently opposed Oda's efforts to impose a closed situation. Because an exclusive agency was not normally a part of a safety group plan, it cannot be concluded at this summary state that the exclusive agency was an unintentional aspect of the safety group, or an incidental consequence of the other arrangements. The novelty of the closed agency aspect of this arrangement suggests that exclusion was intended. Moreover, the communications among IBEW, PECA, and Segal indicate that PECA's opportunity of reaping commission income was a definite consideration in the minds of the principal actors a reinforcement of the inference that the closed aspect of the insurance solicitation was intentional.
 
 
 80
 An intent to exclude is "anticompetitive." Oda/PECA may not have intended to drive the plaintiffs out of this business, and they may have had no animosity specifically directed against any of the plaintiffs. But, within the limited context of the sale of workmen's compensation insurance to electrical contractors, plaintiffs and Oda/PECA were in competition. To the extent that defendants' combination was designed to enable Oda/PECA to capture the contractors' market in INA/PEIC policies, it was equally aimed at excluding the plaintiffs from that market. "It is . . . not always necessary to find a specific intent to restrain trade . . . in order to find that the antitrust laws have been violated. It is sufficient that a restraint of trade . . . results as the consequence of a defendant's conduct or business arrangements." (United States v. Griffith (1948) 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236.) As we recently explained, proof of anticompetitive motivation does not require a showing that defendants intended to harm a competitor. (United States v. Hilton Hotels Corp. (9th Cir. 1972) 467 F.2d 1000, 1002-03.)
 
 
 81
 In Hilton Hotels, the hotels, restaurants, and hotel and restaurant supply companies of Portland, Oregon, had organized an association to attract conventions to the city. To finance the operations of the association, they required members to make certain contributions and, to enforce that requirement, the hotels agreed to curtail purchases from those suppliers who failed to make their contributions. Although we concluded that the sole purpose of defendants' refusal to deal was " 'to bring convention dollars into Portland' . . . (,) the necessary and direct consequence of defendants' scheme was to deprive uncooperative suppliers of the opportunity to sell to defendant hotels . . . and to deprive defendant hotels of the opportunity to buy supplies from such suppliers . . . . Defendants therefore 'intended' to impose these restraints upon competition in the only sense relevant here." (Id. at 1002.) (emphasis added)Although the purpose of defendants' combination may have been only to provide PECA with additional financial support to help it perform its various functions on behalf of the electrical contractors' industry, the "necessary and direct consequence" of their action was to restrain the trading opportunities of both the contractors and the plaintiff insurance agents. Thus, the anticompetitive effects of the closed agency relationship were clearly "intended." (See also Albrecht v. Herald Co. (1968) 390 U.S. 145, 149-50, 88 S.Ct. 869, 19 L.Ed.2d 998 (plaintiff independent newspaper carrier sued publisher who terminated his distributorship when plaintiff sold newspapers at a price higher than that set by the publisher; publisher hired a solicitation agency to induce newspaper readers to transfer their allegiance to another carrier; and publisher gave customers solicited by the agency to a second carrier; plaintiff's antitrust action was upheld against the combination of publisher, solicitation agency, and second carrier although the agency's only purpose "was undoubtedly to earn its fee"); Cf. Fashion Originators' Guild of America, Inc. v. FTC (1941) 312 U.S. 457, 467-68, 61 S.Ct. 703, 85 L.Ed. 949 (horizontal combination organized to combat style piracy in fashion industry "intended" the anticompetitive effect of boycotting retailers who dealt with style pirates).)
 
 
 82
 The presence of anticompetitive intent and effects would alone be sufficient to distinguish this case from Hawaiian Oke and to constitute a Prima facie case of an unlawful restraint of trade. Plaintiffs' assertion that defendants effectuated this restraint through coercion renders Hawaiian Oke inapposite, and, if coercion were proved at trial, would require treating defendants' arrangement as unreasonable Per se. In Hawaiian Oke, defendants' agreement to switch distributorships was voluntary. Plaintiff presented no evidence that coercion played any role in the parties' dealings with each other. (416 F.2d at 78. Accord Bridge Corp. of America v. American Contract Bridge League, Inc. (9th Cir. 1970) 428 F.2d 1365, 1369-70 (Hawaiian Oke applicable because plaintiffs did not argue that defendants "combined . . . for the . . . purpose of coercing . . .").) Plaintiffs here contend that PECA was in direct competition for the insurance sales of the contractors belonging to the safety group. The gravamen of plaintiffs' claim is that the choice of Oda as insurance agent was imposed by the IBEW/PECA combination, and it was not the result of any voluntary choice among the contractors. The coercion element transforms defendants' combination from an arguably unreasonable one into one which is unlawful Per se.
 
 
 83
 The pivotal question is whether the record before the district court showed that the coercion issue presented no triable issue of fact. Of course, plaintiffs have the burden of proving coercion because that element is essential both to defeat the defendants' immunity arguments and to support the plaintiffs' claim of a Per se violation. On summary judgment, however, the burden was upon the defendants, who moved for summary judgment, clearly to establish the non-existence of any genuine issue of fact material to judgment in their favor. (E. g., SEC v. Koracorp Industries, Inc. (9th Cir. 1978) 575 F.2d 692, 697; 6 Pt. 2 J. Moore, Federal Practice P 56.15(4), p. 56-511; id. P 56.15(8), p. 56-643.) Defendants, other than the insurance carriers, failed to carry that burden. The burden is especially difficult to meet when the material fact asserted to be in dispute is coercion, because proof of that issue turns on such subjective factors as defendants' motives and intent, the credibility of their assertions, and contractors' reasonable perceptions of defendants' conduct. (Poller v. Columbia Broadcasting System, Inc. (1962) 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458.) Plaintiffs have articulated the basis of their claim for violation of the Sherman Act and they have succeeded in producing enough evidence to raise a triable issue with respect to coercion.
 
 II
 
 84
 I next turn to the question whether the defendants were immunized from antitrust liability under the McCarran-Ferguson Act (15 U.S.C. §§ 1011-15). The Act was passed in response to United States v. South-Eastern Underwriters Association (1944) 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. Before South-Eastern Underwriters, issuing a policy of insurance was not thought to be a "transaction of commerce." (Paul v. Virginia (1869) 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357.) When the Supreme Court decided that insurance transactions were subject to federal regulation under the commerce clause and that the antitrust laws were applicable to them, Congress enacted the McCarran-Ferguson Act. The Act states that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." (15 U.S.C. § 1011.) "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." (Prudential Insurance Company v. Benjamin (1946) 328 U.S. 408, 429, 66 S.Ct. 1142, 90 L.Ed. 1342.)
 
 
 85
 The McCarran-Ferguson Act's exemption of the insurance business is fitful. The Act provides that the antitrust laws "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." (15 U.S.C. § 1012(b).) The Act also provides that the Sherman Act would remain applicable to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." (15 U.S.C. § 1013(b).) We need not dwell upon whether the acts alleged to violate the antitrust laws were part of the "business of insurance," or whether the business of insurance was "regulated by State law," because the plaintiffs have alleged sufficient facts to bring them within the coercion exclusion from the exemption. (E. g., Ballard v. Blue Shield of Southern West Virginia, Inc. (4th Cir. 1976) 543 F.2d 1075, 1078.)
 
 
 86
 IBEW and Fujikawa also claim that they are immune from antitrust liability under the so-called labor exemption. The sources of the labor exemption from the antitrust laws are those provisions of the Clayton Act (15 U.S.C. § 17 and 29 U.S.C. § 52) and the Norris-LaGuardia Act (29 U.S.C. §§ 104, 105, 113) which declare that labor unions are not combinations or conspiracies in restraint of trade and which specifically exempt certain union activities, such as secondary picketing and group boycotts, from the reach of the antitrust laws. (Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100 (1975) 421 U.S. 616, 621-22, 95 S.Ct. 1830, 44 L.Ed.2d 418.)
 
 
 87
 The statutory exemption was designed to insulate legitimate collective activity by employees, which is inherently anticompetitive but favored by national labor policy, from the proscriptions of the antitrust laws. (See Apex Hosiery Co. v. Leader (1940) 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311.) As Mr. Justice Frankfurter explained in United States v. Hutcheson (1941) 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788, the statutory exemption immunizes from antitrust liability all legitimate labor activities undertaken by a union in furtherance of its own interests "(s)o long as (the) union . . . does not combine with non-labor groups." Where concerted action or agreements between unions and "non-labor groups" is involved, the statutory exemption is unavailable. (Allen Bradley Co. v. Local Union No. 3, IBEW (1945) 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.) In order properly to accommodate the congressional policy favoring the peaceful resolution of employer-union disputes through bargaining, the Supreme Court has held that certain union-employer agreements must be accorded a limited non-statutory exemption from antitrust sanctions. (E. g., Connell Construction, supra.)[3]
 
 
 88
 The contours of the non-statutory labor exemption have been developed by the Supreme Court in four major decisions over the past thirty years. Although the Court's opinions were tailored largely to the fact situations of the particular cases with which it was confronted, a few general principles useful in determining the availability of the labor exemption have emerged. First, if a union-employer agreement has a direct and immediate impact on competition in some product market then, subject to the principles discussed further below, the parties to the agreement may be liable under the antitrust laws without the shield of the labor exemption. (See Connell Construction, supra, 421 U.S. at 624-25, 95 S.Ct. 1830; Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co. (1965) 381 U.S. 676, 691, 85 S.Ct. 1596, 14 L.Ed.2d 640; UMW v. Pennington (1965) 381 U.S. 657, 663, 85 S.Ct. 1585, 14 L.Ed.2d 626; Allen Bradley, supra, 325 U.S. at 808-11, 65 S.Ct. 1533.) Agreements which directly fix prices or deny access to the business market to competitors of the employers who are parties to the agreement are particularly suspect, and the labor exemption is very unlikely to be available in such a situation. (See Pennington, supra, 381 U.S. at 663, 85 S.Ct. 1585 (a union-employer agreement designed to protect wages through fixing prices cannot be shielded from antitrust liability by the labor exemption); Allen Bradley, supra, 325 U.S. at 809, 65 S.Ct. 1533 (a union may not seek to increase job opportunities for its members by combining with employers to eliminate the employers' competitors from the market); Bodine Produce, Inc. v. United Farm Workers Organizing Comm. (9th Cir. 1974) 494 F.2d 541, 551 ("union cooperation which enables one or more employers to obtain control of the supply and price of a certain product in a particular market, or to make possible the elimination of troublesome competition, is unmistakably tainted"); P. Areeda, Antitrust Analysis (2d ed. 1974) at 104 ("there is no exemption where the union agrees with one or more employers to deny competing employers access to the market").)
 
 
 89
 Second, a union may not combine with one set of employers and agree to impose terms of a union-employer accord on other employers who are competitors of the first employers and not parties to the agreement. This principle emerged in Pennington where the complaint charged that the UMW had conspired with the large coal operators to eliminate the smaller companies by agreeing to impose the terms of the 1950 Wage Agreement existing between the large operators and the union on all the coal companies regardless of a particular company's ability to pay. Although the Court found that the agreement concerned wages "the very heart of those subjects about which employers and unions must bargain" and that the effect on the product market "results from the elimination of competition based on wages . . . which is not the kind of restraint Congress intended the Sherman Act to proscribe" (381 U.S. at 664, 85 S.Ct. at 1590), the agreement to impose the wage terms on the small coal operators was held subject to the antitrust laws because it operated directly on employers who were not parties to the agreement.[4]
 
 
 90
 Third, where an agreement has an immediate impact on the product market, federal labor policy is implicated sufficiently to prevail and to protect the agreement from antitrust liability only where the agreement directly concerns a mandatory subject of bargaining. (See Jewel Tea, supra, 381 U.S. at 680, 85 S.Ct. 1596; Pennington, supra, 381 U.S. at 665, 85 S.Ct. 1585; Mackey, supra, 543 F.2d at 614.) But the fact that a restriction on competition is "intimately related" to the attainment of a legitimate labor goal, even if it is a mandatory subject of bargaining, while a necessary prerequisite to the labor exemption is not a sufficient condition. (Pennington, supra, 381 U.S. at 664-65, 85 S.Ct. at 1590 ("This is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining . . . ."). See also Jewel Tea, supra, 381 U.S. at 694, 85 S.Ct. 1596; But cf. Jewel Tea, id. at 732-33, 85 S.Ct. 1596 (Goldberg, J., concurring, would exempt all agreements directly concerning mandatory subjects of bargaining).)
 
 
 91
 Where an agreement has both a direct and substantial impact on competition among businessmen and an immediate and concrete effect on a mandatory subject of bargaining, the Court has first determined whether the agreement's anticompetitive effect is an incidental, derivative consequence of the effort to effectuate labor's legitimate objective, or, rather, whether the anticompetitive effect is independent of the restriction directly necessary to serve labor's concerns. The application of this "least restrictive means" approach is illustrated in Jewel Tea. There, a Chicago retail meat market chain sued seven union locals and the Chicago area association of retail food stores, alleging that the defendants had conspired to restrain competition among the retail meat markets by limiting the marketing hours for the sale of fresh meat, through a clause in the collective bargaining agreement between the association and the union and in the agreement between the plaintiff and the unions. Jewel Tea contended that the purpose of the marketing hours restriction was to aid small butcher shops by preventing self-service meat markets, like plaintiff's, from operating at night when the smaller shops were closed. The Court decided that the effect of the restriction on competition in the meat marketing business was "apparent and real." (381 U.S. at 691, 85 S.Ct. 1596.) Unlike Pennington, the Court found there was no claim that the union and small shop owners had conspired together to impose the marketing restrictions on Jewel Tea. (Id. at 688, 85 S.Ct. 1585.) Turning to the labor aspect of the agreement, the Court concluded that the specific hours of employment, as well as the number of hours, were a component of the working hours which had been considered a mandatory subject of bargaining. The marketing hours restriction thus operated in an area where "the concern of union members is immediate and direct." (Id. at 691, 85 S.Ct. at 1603.) The question for the Court then became one of fact: Were night operations feasible without butchers and without infringing on butchers' interests? If so, then the agreement was overbroad because it went beyond the direct implementation of butchers' concerns and unnecessarily restricted competition. If not, the anti-competitive consequence was simply a derivative, incidental result of the union's legitimate effort to fix the hours of work. Adopting the district court's conclusion that night operations without butchers were infeasible, the Court held that the labor exemption was available to shield the marketing hours clause from antitrust liability. (Id. at 694-97, 85 S.Ct. 1585.) (See also Connell Construction, supra, 421 U.S. at 624, 95 S.Ct. at 1837 (agreement had "significant adverse effects on the market and on consumers effects unrelated to the union's legitimate goals of organizing workers and standardizing working conditions.").)
 
 
 92
 IBEW's alleged agreement with the insurance carriers and with PECA, together with PECA's arrangement with Oda, had a direct and immediate effect of excluding plaintiffs from the relevant market. This arrangement operated to deny plaintiffs, who were Oda/PECA's competitors, access to the non-PECA contractors. That agreement is "unmistakably tainted." (Bodine Produce, Inc. v. United Farm Workers Organizing Comm., supra, 494 F.2d at 551. Accord Allen Bradley Co. v. Local Union No. 3, IBEW, supra, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.) The restraint on trade primarily affected non-parties to the agreement. Plaintiffs contend that the arrangement was nothing more than an effort by IBEW and PECA to coerce the non-PECA contractors into purchasing their insurance through Oda. Although one aspect of this arrangement was that Oda/PECA were in competition with plaintiffs for insurance business within the context of the safety group, PECA contractors were normally in competition with non-PECA contractors in respect of every other phase of their contracting businesses. The closed agency agreement directly benefited PECA members by providing the association with additional income and by making possible a reduction in PECA dues. No similar direct benefits resulted to non-members. Therefore, one consequence of the agreement was to make PECA membership more attractive. Although the competitive advantage occurring to PECA members from a reduction in the dues obligation might be small, the closed agency arrangement did tend to strengthen the position of PECA and of PECA members, thereby potentially restraining competition in the electrical contractors' field as well as in the insurance agents' business. Thus, here, as in Pennington, the inference can be drawn that the arrangement was an effort by a union and one group of employers to impose a requirement on the employers' competitors.
 
 
 93
 It is well established that the benefits of an insurance program are among the "non-wage" conditions of employment which have been considered mandatory subjects of bargaining. (See Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Div. (1971) 404 U.S. 157, 159, 92 S.Ct. 383, 30 L.Ed.2d 341; Inland Steel Co. v. NLRB (7th Cir. 1948) 170 F.2d 247, 251 (accepting the Board's conclusion "that the term 'wages' . . . must be construed to include emoluments of value, like pension and insurance benefits, which may accrue to employees out of their employment relationship").) Whether the selection of the insurance agent for a workmen's compensation program is also a mandatory subject of bargaining turns on whether the benefits available under the insurance scheme are inextricably bound up with the identity of the insurance agent. (Cf. Oil, Chemical & Atomic Workers v. NLRB (1976) 178 U.S.App.D.C. 278, 547 F.2d 575, 582 n. 6; Connecticut Light & Power Co. v. NLRB (2d Cir. 1973) 476 F.2d 1079, 1082-83 (only where identity of insurance carrier is closely bound up with benefits available under insurance plan is the selection of a carrier a mandatory subject of bargaining); Bastian-Blessing, Div. of Golconda Corp. v. NLRB (6th Cir. 1973) 474 F.2d 49, 54 ("We have sought to find a way to separate the carrier from the benefits in this case, and we have failed. . . . Under these facts, the Board's remedy that the benefits be restored by restoring 'the preexisting . . . plan' as a single 'ball of wax' appears justified.").)
 
 
 94
 We are then left with the question whether Oda's role, as a conduit through which commissions flowed to PECA was essential to the safety group program. If that question is answered affirmatively, then the PECA/IBEW agreement has a "direct and concrete" impact on a labor subject, and its anticompetitive effects are no more than the incidental, derivative consequences of the "labor" aspect of the agreement. If the question is answered negatively, then the closed agency arrangement has at best an indirect effect on attaining legitimate labor goals and its harmful impact on competition is far greater and more immediate than is necessary to serve labor interests.
 
 
 95
 In my view, the record before us is inadequate to provide a definitive answer to that critical question. The district court did not expressly address the issue. Although the court said that the labor exemption provided no protection for the IBEW/PECA plan (405 F.Supp. at 113), the court earlier found it "clear from plaintiffs' evidence that a single broker or solicitor must coordinate the group plan if it is to achieve all of the objectives previously cited," and further that it was "laudatory" that the coordinating broker should be willing to use his profits to cover the expenses of the program. But the only evidence that the court cited in support of its conclusion that a single broker was needed was a statement of a vice president of one of the insurance agent plaintiffs explaining that group plans may be set up on either an open or a closed basis. (See 405 F.Supp. at 111, nn. 50 & 51 and at 103, n. 11.) The only other evidence in the record is the repeated assertion by INA that an exclusive agent of record is not a necessary prerequisite to the success of a group plan. On remand, I would have the district court consider whether Oda's role is "so intimately related" (Jewel Tea, supra, 381 U.S. at 689, 85 S.Ct. 1596) to the administration of plan as to render it necessary and further to consider whether the anti-competitive consequences of the agreement in two product markets are justified on the ground that Oda's role was strictly necessary to the survival of a plan beneficial to the union members.
 
 III
 
 96
 I concur with the majority's conclusion that the insurance carrier defendants were properly granted summary judgment. INA/PEIC did not participate in any of the discussions in 1973 among IBEW, PECA, and Segal, concerning the desirability of a safety group plan, the various methods of establishing the program, and the possible benefits which the scheme might have in improving PECA's deteriorating financial condition. The insurance carriers did not enter the picture until after the end of the year when INA/PEIC submitted its bid to be carrier for the safety group. INA played no role whatever in giving Oda an exclusive agency relationship. Indeed, it has sold safety group policies through other agencies when those other agents were available. The company has never indicated any interest in providing Oda with an exclusive designation, and it had nothing to gain from such an arrangement. Indeed, it may have stood to lose goodwill of other Hawaiian insurance agents, who sold other kinds of INA policies. From the time INA received notification that it would be the carrier for the safety group, it has repeatedly insisted that the group be an open one. It communicated this thought to Segal, to Oda, to the PEIC San Francisco office, to Yamada, and to PECA's attorney. (405 F.Supp. at 106.) In short, there is no evidence in the record suggesting that INA/PEIC were in any way active in a scheme to make Oda the exclusive agent for the safety group or that they took any other steps to further the scheme.
 
 
 97
 The union and trade association defendants present a very different picture. As to them, there is substantial evidence that they combined with the common goal of utilizing the safety group scheme as means of providing the association with new income. They jointly decided to make Oda the agent of record in order to further that purpose. The union denied that it played any role in inducing contractors to purchase their insurance through Oda or that it threatened any contractor with labor trouble, or the institution of grievance proceedings, if any particular firm failed to place insurance through Oda. However, plaintiffs need not prove that the union acted coercively to implement the PECA/IBEW plan. "Proof of participation in a course of conduct that has the necessary consequence of barring entry of competition into the market would provide the basis for a finding of a combination." (Helix Milling Co. v. Terminal Flour Mills Co., supra, 523 F.2d at 1322, Citing Albrecht v. Herald Co. (1968) 390 U.S. 145, 149-50, 88 S.Ct. 869, 19 L.Ed.2d 998.) The district court correctly decided that plaintiffs have shown that the union and the trade association participated in a common plan to use Oda's position to enable PECA to derive income from the project.
 
 
 98
 For purpose of resisting summary judgment, the record contains enough evidence, together with inferences necessarily drawn in favor of the plaintiffs, to show a triable issue of fact in respect of claimed coercion. To be sure, Oda's dealings with non-PECA contractors who were reluctant to buy insurance through Oda were not explicitly coercive. But when these dealings are viewed in the context of the contractors' relationship to him and to PECA, an inference arises that coercion was implicit. In his role as executive secretary of the trade association which normally bargained with the union on behalf of the contractors, he appeared to be a disinterested person advising the contractors who were confused about their obligations with respect to workmen's compensation. Oda answered those questions through a steady stream of letters and telephone calls in which he told the contractors that the union contact required them to take INA/PEIC policies, and he warned them that the failure to do so left them "in violation of your union contract." He sent them INA applications and repeated follow-up letters, and directed each of them to return the application to him. The inference arises that Oda, at some point along the line, dropped his role as disinterested advisor and became the highly interested insurance solicitor. The duality of his role was matched by PECA. PECA changed from a trade association representing the interests of all the contractors in their dealings with the union into a membership organization seeking financial support from the business of non-members. The course of dealing both by Oda and by PECA was deceptive, and the inference is certainly permissible, if not absolutely compelling, that both the intent and the effect were coercive.
 
 
 99
 I would reverse the grant of summary judgment in favor of IBEW, PECA, Oda, and Fujikawa and remand the case for trial against those defendants.
 
 
 
 [1]
 In a second count, the appellants alleged that the collective bargaining agreement violated § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1970). The District Court rejected this claim, 405 F.Supp. at 114-18, and the appellants do not renew the contention on appeal
 
 
 [2]
 In summarizing the facts, we have borrowed extensively from the District Court's thorough exposition. Id. at 102-07
 
 
 [3]
 Oda testified that the requirement included by the First Insurance Company that contractors have a free choice of agents did not meet the bid specifications. Appellants argue that the First Insurance Company bid was rejected for this reason. The bid proposal did not, however, preclude free choice of agents. In addition, White, not Oda, was responsible for the rejection of bids, and Oda testified that he did not know why the bid was rejected
 
 
 [4]
 At this meeting Jacobson stated that he knew of no other instance in the United States in which a labor agreement required that employers participate in a particular group workmen's compensation program
 
 
 [5]
 An agent of record is a solicitor who sells a particular policy to a particular insured
 
 
 [6]
 One member of BMF stated in an affidavit that in June, 1974 a PECA representative told him that he "would not be allowed to sell or service workmen's compensation insurance business with any of the signatory electrical contractors . . . regardless of whether such insurance was placed with (PEIC)." Nevertheless, two months later BMF received an appointment from PEIC
 
 
 [7]
 Assuming Arguendo, as did the District Court, 405 F.Supp. at 109, that the appellees implicitly agreed to utilize Oda exclusively, such an arrangement would still lack the distinguishing characteristics of boycotts that have been labeled illegal Per se. Appellees are not a horizontal combination of competitors organized to exclude direct competition, which the Supreme Court condemned in Eastern States Retail Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914) (lumber retailers blacklisted wholesalers who sold to retailers' customers). Nor are IBEW/PECA and INA/PEIC vertically aligned with the intent to exclude competitors from one of their markets, as in Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (single retailer induced manufacturers to exclude competing retailer). Unlike Broadway-Hale Stores in Klor's, PECA, Oda, and the contractors agreed to deal with Oda alone, not to improve Oda's competitive position as an insurance solicitor but to aid PECA and to improve the quality of the contractors' insurance plan. Nor were the appellants able to show any concerted refusal to deal, designed so as to influence the trade practices of the appellants. See Kiefer-Stewart Co. v. Joseph E. Seagrams & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (liquor manufacturers collectively refused to sell to price-cutting wholesalers); Fashion Originators' Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (original designers refused to sell to retailers who sold copies of the original designs). See generally E. A. McQuade Tours, Inc. v. Consolidated Air Tours Manual Comm., 467 F.2d 178, 186-87 (9th Cir. 1972), Cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973)
 Under the assumption that there was a boycott, the requirement that all the contractors participate in the group plan and purchase PEIC insurance does not affect our application of the Per se doctrine. The contractors who may have preferred not to join the plan are not boycott victims, and the impact of the arrangement on insurance agents is no different qualitatively because of the mandatory nature of the plan. See 405 F.Supp. at 108 n. 43.
 Thus, in the absence of any of the competitive injuries wrought by the classic-type boycotts traditionally considered as unlawful Per se, the District Court properly rejected application of the Per se rule. Joseph E. Seagrams & Sons v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), Cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), is instructive. Two distillers, who were dissatisfied with the performance of their joint distributor, agreed to transfer their business to a new distributor. Our court refused to apply the Per se rule because of the lack of evidence that the distillers were motivated by a purpose other than the desire to improve the distribution of their products. Id. at 78, 80. Similarly, there is no indication here that the appellees established their group plan of insurance, with its alleged boycott of appellants, in order to protect Oda from competing insurance solicitors. Rather, their motive was clearly shown to be the improvement of the quality of their insurance coverage and the decrease of its cost. See also Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), Aff'g, 537 F.2d 980 (9th Cir. 1976) (considerations militating against use of Per se rule).
 
 
 [8]
 In this summary proceeding the District Court, despite the dearth of evidence, assumed that a majority of the PECA-member contractors and Oda agreed that henceforth the contractors would purchase insurance only through Oda, compelling all signatory contractors to the collective bargaining agreement to do likewise. 405 F.Supp. at 111. In light of the factors discussed below, this assumption would not lead to a different result in our application of the standard of reasonableness
 
 
 [1]
 See Minutes of PECA Board of Directors meeting of May 23, 1973: "Mr. Fujikawa (the IBEW Business Manager) . . . feels that by charging the electrical contractors a fee for this service we could supplement our income. Furthermore, non-member contractors will be required to participate through the industry plan." See also Minutes of PECA directors meeting of September 27, 1973: "Since the non-association members would also be participating, this could be a means of assessing them for the services we provide." Letter of Oda to Berton Jacobson, Executive Vice President of Segal, October 19, 1973: "Blackie Fujikawa has stated that the Association Dividend Group Plan will be a means for the PECA to assess the non-members for the services we have been providing them throughout the years in negotiating and servicing their union agreement."
 
 
 [2]
 Letter of Oda to Jacobson, Supra. See also Minutes of meeting of September 27, Supra, "the dividends received could be allocated towards off-setting dues."
 
 
 [3]
 The labor exemption applies to the union-employer Agreement not just to the union. Those non-labor groups who were parties to the agreement on which antitrust liability is predicated may also avail themselves of the labor exemption shield (See Mackey v. National Football League (8th Cir. 1976) 543 F.2d 606, 612; Scooper Dooper, Inc. v. Kraftco Corp. (3d Cir. 1974) 494 F.2d 840, 847 n. 14; Cf. Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co. (1965) 381 U.S. 676, 729-30, 85 S.Ct. 1596, 14 L.Ed.2d 640 (Goldberg, J., concurring) (a finding that the labor exemption is unavailable to the union necessarily exposes the employer to antitrust liability). Thus, should the labor exemption be found applicable to immunize defendants' agreement, all the defendants, not just IBEW and Fujikawa, could rely on it
 Plaintiffs contend that defendants cannot raise the labor exemption on this appeal because the district court ruled against the defendants on this point below and the defendants failed to take a cross-appeal. But the failure to cross-appeal creates no bar to our consideration of the labor exemption question. "The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court." (Dandridge v. Williams (1970) 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156, 25 L.Ed.2d 491. See also United States v. American Railway Express Co. (1924) 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087. (". . . the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court . . . .").)
 
 
 [4]
 The Eighth Circuit has generalized the rule in Pennington into a principle requiring that a restraint on trade which results from a union-employer agreement must "primarily (affect) only the parties to the collective bargaining relationship." (Mackey v. National Football League (8th Cir. 1976) 543 F.2d 606, 614. See also Connell Construction, supra, 421 U.S. at 624-26, 95 S.Ct. 1830 (union-employer agreement had significant affect on employer who had no collective bargaining relationship with the union and had no employees that the union sought to represent).)